Michael G. Callaizakis *et al.*, Plaintiffs-Appellants, *v.* Astor Development Co. *et al.*, Defendants—(Uptown Federal Savings & Loan Association of Chicago, Defendant-Appellee.)

(No. 55251;

First District—February 18, 1972.

Wildman, Harrold, Allen & Dixon, of Chicago, (Max E. Wildman, Thomas D. Allen, and Jerald P. Esrick, of counsel,) for appellants.

Baker & McKenzie, of Chicago, (Kurt M. Penn and Francis D. Morrissey, of counsel,) for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Plaintiffs appeal from the dismissal of defendant, Uptown Federal Savings & Loan Association of Chicago, as a party defendant. The trial court certified that the dismissal was to be considered a final and appealable order.

This is a class action. The two classes of plaintiffs are (1) owners of condominium apartments located at 6101 North Sheridan Road East, Chicago, Illinois (hereinafter "East Point"), and (2) owners of condominimum apartments at East Point who purchased their apartments from the builder and developer, Astor Development Company, a defendant in this action. Also joined as defendants were Morris Handler Company, Inc., (the general contractor), The Arpen Group, Inc., (the architect), Commonwealth Edison Company, (a sub-contractor), and the defendant-appellee, Uptown Federal Savings & Loan Association of Chicago (the financer of the project and hereinafter "Uptown").

The relevant counts of the complaint sound in tort and allege that the defendants were all guilty of various negligent acts and omissions which caused East Point to be constructed with substantial structural defects. The sole issue on this appeal is whether the amended complaint states a cause of action against the defendant Uptown. We, therefore, set forth below the pertinent portions of the amended complaint.

After stating that the premises "were not constructed in a good and workmanlike manner or in accordance with the representations and agreements made by defendant Astor" (the builder and developer), and then specifying the various structural defects, plaintiffs alleged the following:

"(12). Defendant Uptown was aware of the purposes for which its construction loan to Astor was to be used and was aware of the fact that the condominium units in East Point were to be sold to the general

public. Uptown was aware of the advertising done and used to promote the sale of units in East Point, and was aware of the form and contents of the purchase agreements entered into between Astor and plaintiffs.

(13). Plaintiffs believe that defendant Uptown, through its duly authorized agents, inspected the East Point premises on several occasions during its construction and prior to the taking of possession by plaintiffs, for the purpose of determining whether said premises were being constructed in accordance with the plans and specifications and in a good and workmanlike manner fit for habitation and occupancy, and to determine whether said premises complied with the purchase agreements entered into by plaintiffs. Plaintiffs believe that Uptown employed its own architects and engineers to inspect and supervise the construction of East Point, and for the aforesaid purposes, and that said architect and engineer inspected the construction site on numerous occasions prior to completion. As a consequence of its inspection of the premises, Uptown assumed a duty to the plaintiffs to inspect the premises in a careful manner so as to detect defective workmanship and materials and to so inform plaintiffs prior to their payment and taking of possession."

Plaintiffs contend that the sole issue is whether a savings and loan institution which finances a residential construction project owes an independent duty to the original and subsequent owners of homes or apartments therein "[t]o exercise reasonable care that the homes are constructed without defects, if the activities of the savings and loan association in connection with the construction project take on attributes beyond the domain of the usual lender of money." In their complaint plaintiffs not only alleged defendants' duty to detect defective workmanship and materials but a duty to inform plaintiffs of such defects. They claim this question is one of first impression in this state. Both parties rely extensively on *Connor v. Great Western Savings and Loan Association* (1968), 73 Cal. Rptr. 369, 447 P.2d 609, aff'g. 61 Cal. Rptr. 333 (Dist.Ct.App. 1967), in which the California Supreme Court (Traynor) held that under the facts of that case the financial lending institution did owe a duty to the purchasers of residential homes to exercise reasonable care so that the homes were built free of construction defects. Each party interprets *Connor* as being supportive of its respective position.

Plaintiffs urge that the allegations in the amended complaint place this case within the rule laid down in *Connor*. They then argue that the Illinois courts should adopt the *Connor* rationale.

Defendant, on the other hand, contends that on its facts *Connor* is

distinguishable from the allegations set forth in the amended complaint and that the *Connor* holding should not be expanded to meet the alleged facts. As a backup argument, defendant states that even if the amended complaint states a cause of action under *Connor*, the *Connor* decision should not be adopted in this state on policy grounds.

A detailed discussion of *Connor* is necessary. The plaintiffs in *Connor* were purchasers of homes from Canejo Valley Development Company (hereinafter Canejo). Defendant, Great Western Savings and Loan Association (hereinafter Great Western), was a large California lending institution which financed the residential project. Great Western was approached by a land developer, David Goldberg, who was then president of South Gate Development Company. South Gate sought a loan in order to purchase a 100 acre tract of land in Ventura County, California, and to construct residential homes thereon. After coming to terms on the details of the project, Great Western loaned South Gate the funds to purchase the tract. Thereafter Canejo was substituted for South Gate as purchaser of the tract. Canejo had been incorporated several months earlier. Its net capital was $5000. Great Western knew that both Goldberg's and South Gate's financial conditions were weak and that Goldberg and his business associate had little experience in the construction industry. It required Canejo to submit plans and specifications for the various types of proposed homes. Great Western did not examine the foundation plans, as was its usual procedure when making a construction loan, nor did it make recommendations as to design or construction. As the court stated, "It was preoccupied with selling prices and sales."

Great Western's financial interests in the project were substantial. It received the following: (1) 6.6% interest on the construction loan of $3,000,000 to Canejo; (2) a 5% construction loan fee; (3) the right of first refusal to supply mortgage funds to the eventual purchasers of homes; if a purchaser approved by Great Western wished to obtain long term financing elsewhere, Great Western had 10 days to meet the terms of the proposed financing; if it met the terms but the buyer still financed elsewhere, South Gate Development Company, Goldberg and his business associate were liable to Great Western for the fees and interest obtained by the other lender; (4) a 1.0 to 1.5% loan fee from Canejo for every purchaser who obtained mortgage funds from Great Western; (5) a 20% capital gain on its land investment resulting from a financial technique called "land warehousing" whereby Great Western financed the original purchase of the 100 acre tract and held title to it until the developer (Canejo) was ready to use it; at that time Canejo would

repurchase the land from Great Western at a price 20% above Great Western's cost.

Great Western had agreed to make the necessary construction loans to Canejo only "after assuring itself that the homes could be successfully built and sold." During the course of construction Great Western's inspectors visited the property weekly to verify that the plans were being followed and that money was being disbursed only for work completed.

The court found that Great Western and Canejo were not participants in a joint venture so as to render Great Western vicariously liable for Canejo's negligent acts but that Great Western owed an independent duty to exercise reasonable care to prevent construction defects and the sale of seriously defective homes to purchasers.

After noting that Great Western surely owed its own shareholders the duty to use reasonable care so that the homes were free of defects since the homes were the collateral Great Western would be given to secure the mortgage loans, the court went on to discuss the reasons for its holding, the pertinent ones being:

■ Great Western's transactions were intended to affect the plaintiffs significantly. [Here the court noted the extensive financial involvement of Great Western at all levels of the construction project].

■ Great Western could reasonably have foreseen the risk of harm to plaintiffs. [Here the court noted that Great Western knew or should have known of the developer's lack of experience in the construction field and of Canejo's thin capitalization.] * * *

■ The injury suffered by plaintiffs was closely connected with Great Western's conduct.

Great Western not only financed the development of the tract but controlled the course it would take.

■ Substantial moral blame attaches to Great Western's conduct. [Here the court noted that Great Western had breached a duty to its own shareholders and that home owners are ill-equipped to discern structural defects.]

■ The admonitory policy of the law of torts calls for the imposition of liability on Great Western for its conduct in this case. Rules that tend to discourage misconduct are particularly appropriate when applied to an established industry."

■■ We now address ourselves to whether the facts alleged in plaintiffs' amended complaint state a cause of action under the *Connor* holding. Plaintiffs note that we must consider all allegations and reasonable inferences therefrom as true (*Windsor Lake, Inc. v. Wrok,* 94 Ill. App.2d 403, 236 N.E.2d 913) and that a dismissal is proper only where

under no set of circumstances could the allegations support a cause of action. *Johnson v. North American Life & Casualty Co.*, 100 Ill.App.2d 212, 241 N.E.2d 332.

■■ Applying the foregoing standards we nevertheless believe that the allegations stated in plaintiffs' amended complaint fail to state a cause of action under the theory of tort liability asserted in *Connor.*

The only factors alleged in plaintiffs' amended complaint which were present in *Connor* are that defendant made a construction loan to the developer, had its agents inspect the premises on several occasions, and employed its own architect and engineers to inspect and supervise the construction of East Point. Missing from the complaint were the following factors which were present in *Connor* and on which that court relied heavily: (1) that the lending institution received large financial rewards for its overall role in the construction project; *i.e.*, in addition to earning interest on the construction loan, Great Western extracted a 5.5% construction loan fee, a right of first refusal on supplying mortgage funds to purchasers with penalties accruing to the developer if the purchasers financed elsewhere on the same terms as offered by Great Western, a 1.0 to 1.5% fee for each mortgage loan, and a 20% capital gain on its investment in the land tract; and (2) that the developer was inadequately equipped to properly handle the construction of the project; *i.e.*, Great Western knew or should have known that the developer was inexperienced in the construction field and that it was grossly undercapitalized "creating a readily forseeable risk that it would be driven to cutting corners in construction." *Connor, supra*, at 617.

Plaintiffs in an effort to support their position that "virtually every aspect held to be important by the California Supreme Court (in holding Great Western liable) * * * was either actually present or probably present in Uptown's participation in the East Point Development," asks us to "safely assume" that defendant received substantial service fees for providing the construction loan. Further, plaintiffs urge that after pursuing discovery procedures it might be revealed that Uptown actually had a right of first refusal on mortgage loans to condominium purchasers with a penalty fee to Uptown in case financing was found elsewhere. Plaintiffs cite a comment in the University of Chicago Law Review to support its statement that these factors "were probably present" in the instant case. See Comment, Liability of the Institutional Lender for Structural Defects in New Housing, 35 U. Chi. L. Rev. 739, 744.

■■ We must determine whether these facts may be reasonably inferred from the facts actually alleged in the complaint so as to be of relevance in determining whether the complaint states a cause of action. Even construing the complaint liberally we cannot assume that defendant

received a construction loan fee nor that discovery would disclose a right of first refusal with a penalty if other financing was utilized.[1] These assumed facts simply do not follow from any specific facts alleged in the complaint. See *Pierce v. Carpentier*, 20 Ill.2d 526, 169 N.E.2d 747; *Kurtzon v. Kurtzon*, 395 Ill. 73, 69 N.E.2d 341; *In Re Application of County Treasurer*, 84 Ill.App.2d 456, 228 N.E.2d 269.

██ We do not believe that the rationale of *Connor* should be expanded to meet the facts alleged in the amended complaint. To do so would possibly effect "a drastic restructuring of traditional economic relationships" as Justice Mosk stated in his dissent in *Connor* at page 622.

The California legislature has taken a similar view. The majority opinion in *Connor* characterized Great Western's activities as taking on "ramifications beyond the domain of the usual money lender." *Connor v. Great Western Savings and Loan Assc., supra*, at 616.

A statute passed by the California legislature (West's Ann. Civ. Code § 3434) after the *Connor* decision incorporates the above phraseology: "A lender who makes a loan of money, the proceeds of which are used or may be used by the borrower to finance the design, manufacture, construction, repair, modification or improvement of real or personal property for sale or lease to others, shall not be held liable to third persons for any loss or damage occasioned by any defect in the real or personal property so designed, manufactured, constructed, repaired, modified or improved or for any loss or damage resulting from the failure of the borrower to use due care in the design, manufacture, construction, repair, modification or improvement of such real or personal property, unless such loss or damage is a result of an act of the lender outside the scope of the activities of a lender of money * * *."

The subsequent California case of *Bradler v. Craig* (Cal.App. 1969), 79 Cal. Rptr. 401, also indicated that *Connor* was to be applied only where the lending institution became an "active participant" in the construction enterprise. The complaint in *Bradler* alleged that the defendant lending institution financed the construction of five homes (of which plaintiff's was one), approved the plans and supervised and inspected

---

[1] Plaintiffs attached the purchase contract between Astor Development Company and the condominium purchasers to the amended complaint. It provided in relevant part as follows:

"Purchasers shall apply within one week herefrom for a ―― year mortgage loan in the amount of $―――― from Uptown Federal Savings and Loan Association. If such approval is not obtained within sixty (60) days after receipt by Uptown * * * of said application, or if a mortgage loan in the same amount and on the same terms from another lender is not tendered to Purchasers by Seller within said sixty (60) day period, then either Purchasers or Seller may cancel this contract by written notice to the other, and upon such notice, Purchasers' payment shall be returned."

the construction in a negligent manner. In holding that no cause of action had been alleged, the court stated at page 407:

"[Defendant's] alleged participation was that of the usual and ordinary construction and purchase money lender, content to lend money at interest on the security of real property. Approval of plans and specifications, and periodic inspection of houses during the construction is normal procedure for any construction money lender."

See also *Rice v. First Federal Savings and Loan Association of Lake County* (Fla.App. 1968), 207 So.2d 22; *cert.* denied, 212 So.2d 879.

Plaintiffs press an analogy in an effort to uphold the amended complaint. They point to the general rule of tort law that one who voluntarily undertakes to do a gratuitous act must do so in a reasonably careful manner. In support, they cite *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769, rev'g 39 Ill.App.2d 73, 187 N.E.2d 425. In *Nelson*, a four to three decision, the Illinois Supreme Court, interpreting Florida law, held that the defendant insurance company was liable to a group of construction workers for injuries and deaths suffered when a materials hoist on which they were riding collapsed. The defendant insurance company insured the general contractor of the project. There was no privity of contract between the defendant and the injured workers. The court stated as follows at page 83:

"* * * [D]efendant did gratuitously undertake to make safety inspections and to render safety engineering services on the courthouse project, and that such inspections were planned, periodic *and directed to the safety of the employees on the project.* Under these circumstances, * * *, it is our opinion that duty devolved upon defendant, owed to the plaintiffs, to make its inspections with due care." (Emphasis supplied.)

The strength of *Nelson* is now dubious. The Illinois legislature abrogated any effect it might have had on Illinois law. See Ill. Rev. Stat. 1969, ch. 48, par. 138.5.[2] A Federal district court in Florida (*Hill v. U.S. Fidelity & Guaranty Co.* (M.D.Fla. 1967), 272 F.Supp. 569) expressly adopted the opinion in *Nelson v. Union Wire Rope Corp.*, 39 Ill.App.2d 73, 187 N.E.2d 425, where the appellate court held that said insurance

---

[2] "(a) No common law or statutory right to recover damages from the employer, his insurer, his broker, any service organization retained by the employer, his insurer or his broker to provide safety service, advice or recommendations for the employer or the agents or employees or any of them for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act, to any one wholly or partially dependent upon him, the legal representatives of his estate, or any one otherwise entitled to recover damages for such injury."

company could not be held liable absent proof of reliance on its inspection measures by the injured workers.

But at any rate *Nelson* is distinguishable on its facts. There, as noted in the above quotation, the defendant's inspection activities were "directed to the safety of the employees on the project." Furthermore, the defendant insurance company stressed its inspection program for preventing injuries when selling its policies to building contractors. As the court stated at page 80:

"[I]t appears beyond a show of a doubt that the services gratuitously given by [defendant's] * * * engineers were not solely for defendant's own purposes."

■■ There are no allegations in the amended complaint which would show that defendant's alleged inspection activities were made for the benefit of the plaintiff condominium purchasers and owners, or that they were made for other purposes than those of a usual money lender. For these reasons we deem the general language of *Nelson* to be inapposite.

In conclusion, plaintiff's amended complaint failed to state a cause of action. The circuit court's dismissal of defendant Uptown from the suit was proper. The judgment is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.