Christiansen et al., Appellants, *v.* Philcent Corporation et al.

158

Argued September 11, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent).

*Samuel Rappaport,* with him *Rappaport and Furman,* for appellants.

*Richard F. Stern,* with him *Robert J. Stern,* and *Stern, Maxmin & Stern,* for appellee.

OPINION BY SPAETH, J., December 11, 1973:

This is an appeal from an order sustaining preliminary objections in the nature of a demurrer, filed by Penn Federal Savings and Loan Association, and dismissing the complaint with respect to appellee.[1] In reviewing this order, only the well pleaded factual allegations of the complaint, together with the reasonable inferences therefrom, but not the pleader's conclusions or averments of law, may be considered. *Eden Roc Country Club v. Mullhauser,* 416 Pa. 61, 204 A. 2d 465 (1964); *Bogash v. Elkins,* 405 Pa. 437, 176 A. 2d 677 (1962). The complaint is in assumpsit, and the well pleaded facts are as follows:

---

[1] The complaint was not dismissed with respect to the other two defendants: Philcent Corp., the builder, and Ralph Heller, the owner of Philcent Corp.

During 1969 and the spring of 1970 appellants (plaintiffs) purchased new homes in a development known as Lombard Mews built by Philcent Corp. Appellee provided all the construction financing and some of the "final mortgages."[2] The homes are inherently defective, having faulty heating and air-conditioning systems, faulty plumbing, warped doors and windows, leaking roofs, other water leakage, cracked stucco, and garages too small to accommodate full-size cars.

Paragraph 7 of the complaint sets forth appellee's connection with the case: "Defendant, Penn Federal Savings and Loan Association, not only provided the construction financing and the final mortgages to many of the purchasers, but was also a co-developer of the project in that it provided substantially all of the construction money required to build the homes of the plaintiffs and exercised supervision and control over the design and construction of the project." Paragraph 24 alleges that appellee's "participation" was made known to appellants by large posters and pamphlets "prominently displayed" in the sales office. Paragraph 25 alleges that these posters proclaimed appellee's participation in other successful housing projects in center city Philadelphia.

It is further alleged that "[appellee] was well aware of the thin capitalization of Philcent Corp. and the precarious position of Defendant, Ralph Heller" (paragraph 27), and that "[appellee] did participate in both the physical and financial planning of the development and indeed was the final arbiter of all problems" (paragraph 28). Finally, it is alleged that appellants relied on the "reputation and expertise" of appellee and were led to believe that appellee "would inspect and supervise the design and construction of their homes" (paragraph 29).

---

[2] "Final mortgage" is not defined, but presumably implies that appellee was the purchase money mortgagee on some of the homes.

Under Pa. R. C. P. 1028(c), appellants had the right to amend their complaint within ten days after the filing of appellee's preliminary objections. They elected, however, not to amend. For purposes of appeal, it will be assumed that they have pleaded as strong a case as they can. *Schwartz v. Manufacturers' Casualty Insurance Co.*, 335 Pa. 130, 6 A. 2d 299 (1939); *Maguire v. Preferred Realty Co.*, 257 Pa. 48, 101 A. 100 (1917).

We hold that the complaint fails to state a cause of action in assumpsit. Insufficient facts are pleaded to show the existence of any contractual relationship between appellants and appellee, much less any duty arising out of a contract.[3]

Appellants rely heavily on their characterization of appellee as a "co-developer" of the project. We surmise that by this appellants intend to allege a relationship between appellee as lender and Philcent Corp. as builder analogous, if not identical, to that of a joint venture. This allegation, however, is not only a conclusion of law, but the complaint fails to state sufficient facts from which the conclusion may logically be inferred.

"The existence or non-existence of a joint venture depends upon what the parties intended in associating together. It must arise from a contractual basis, although the contract need not be express but may be implied from the acts and conduct of the parties. To constitute a joint venture certain factors are essential: (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over

---

[3] We refrain from conjecturing what our decision would be if appellants had chosen to proceed in trespass or if further facts had been alleged to support the action in assumpsit.

the subject matter' of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction. The existence or non-existence of a joint venture depends on the facts and the circumstances of each particular case and no fixed nor [*sic*] fast rule can be promulgated to apply generally to all situations. A joint venture is not a partnership, a tenancy in common, nor a so-called 'mining partnership'; it is an association of parties—of rather recent origin—to engage in a single business enterprise for profit." *McRoberts v. Phelps,* 391 Pa. 591, 598-600, 138 A. 2d 439, 443-444 (1958) (all footnotes omitted). In contrast to such specificity, appellants have alleged in support of their averment that appellee was a "co-developer" only that appellee provided the construction financing and "exercised supervision and control over the design and construction of the project."

Appellants also rely heavily on the decision in *Connor v. Great Western Savings and Loan Ass'n,* 69 Cal. 2d 850, 447 P. 2d 609, 73 Cal. Rptr. 369 (1968). In that case, sounding in tort, the financing institution was held not to be vicariously liable for the contractor's negligence, but directly liable for its own.[4] Even if the distinction between trespass and assumpsit is ignored,[5] the role of the lender in *Connor* was such as to make that case readily distinguishable from the present case. There was substantial consideration beyond the 6.6% interest on the construction loan. The lender set

---

[4] The fact that *Connor* was effectively reversed by a later action of the California legislature (West's Annotated California Codes, Civil §3434 (1970)) does not, as appellee contends, detract from the soundness of the reasoning, which is based on common law principles. Whether, absent a similar legislative enactment in this Commonwealth, we would reach the same result, is a matter which we do not here decide.

[5] The court assumed that there was no privity of contract between a construction lender and the ultimate purchaser of a home.

up a complicated land financing transaction referred to as "warehousing" under which it took title to the land and sold it back to the developer at a 20% profit (with the added consideration that as a result of setting up the transaction in this manner, profits were subject to special tax treatment as capital gains). There was an additional 5.5% "construction loan fee," a fee of 1 to $1\frac{1}{2}\%$ from the developer to the construction mortgagee for every first purchase money mortgage issued, and a right of first refusal to make purchase money mortgages to the buyers of the homes. Penalties accrued to the developer if a purchaser financed elsewhere on the same terms as the lender offered. Thus the court had ample support for its conclusion: "Great Western [the lender] voluntarily undertook business relationships with [the developers] to develop the Weathersfield tract and to develop a market for the tract houses in which prospective buyers would be directed to Great Western for their financing. In undertaking these relationships, Great Western became much more than a lender content to lend money at interest on the security of real property. It became an active participant in a home construction enterprise. Its financing, which made the enterprise possible, took on ramifications beyond the domain of the usual money lender. It received not only interest on its construction loans, but also substantial fees for making them, a 20 percent capital gain for 'warehousing' the land, and protection from loss of profits in the event individual home buyers sought permanent financing elsewhere." *Id.* at 864, 447 P. 2d at 616, 73 Cal. Rptr. at 376.

*Connor* was an appeal from a judgment of nonsuit after plaintiffs had offered all their evidence. Thus a far more extensive exposition of the facts was before the court than would be expected to appear on the face of a complaint. Nevertheless, the complaint in the

present case falls far short of alleging an arrangement as interrelated as the one in *Connor.*

The allegation of appellee's "participation" as manifested by the presence of posters and pamphlets in the rental office adds nothing of substance, for no participation is specified beyond the extension of construction financing. The allegation that appellee was the "final arbiter of all problems" is so general as to amount to no more than a conclusion; it will therefore be disregarded.[6] The allegation that appellants relied on appellee to supervise the design and construction of their homes is also insufficient, for there is nothing to indicate upon what this reliance was founded; if it was some representation in the posters and pamphlets, that fact should have been pleaded.

This case is quite like *Callaizakis v. Astor Development Co.,* 4 Ill. App. 3d 163, 280 N.E. 2d 512 (1972), an appeal from a dismissal of a complaint in negligence. The complaint (which was far more detailed than the one under consideration in this case) alleged that the lender's participation created a duty with respect to the plaintiffs. The court refused to assume or infer the facts that were present in *Connor v. Great Western Savings and Loan Ass'n, supra:* "Even construing the complaint liberally we cannot assume that defendant received a construction loan fee nor that discovery would disclose a right of first refusal with a penalty if other financing was utilized [footnote omitted]. These assumed facts simply do not follow from any specific facts alleged in the complaint." *Callaizakis v. Astor Development Co., supra* at 168-9, 280 N.E. 2d at 516-17.

---

[6] "Approval of plans and specifications, and periodic inspection of houses during the construction is normal procedure for any construction money lender. The allegation that it supervised construction is a conclusion and will be disregarded." *Bradler v. Craig,* 274 Cal. App. 2d 466, 475, 79 Cal. Rptr. 401, 407 (1969).

The order of the court below dismissing the complaint with respect to appellee Penn Federal Savings and Loan Association is affirmed.