This is an appeal from a summary judgment entered in favor of Defendant First Southern Federal Savings Loan Association.
In 1978 Chester and Lyndall Rudolph (Owners) and Associated Builders-Norman Firth (Contractor) entered into a standard Agreement Between Owners and Contractor, which document provided for the construction of improvements to the Rudolphs' home for $19,700.00. The contract set out a "draw schedule" for the payment of monies during the construction and required all draws to be approved by a registered architect after his periodic inspections of the premises under construction.
First Southern agreed to finance the construction on two conditions: 1) that the Rudolphs and their Contractor execute a First Southern construction contract; and 2) that the Rudolphs grant First Southern a mortgage on their property as security for the loan.
The First Southern contract, which superseded the earlier agreement between the Rudolphs and Contractor, materially altered the draw schedule as originally agreed upon *Page 65 
by the parties in that it provided for five equal draws and deleted the required architect's approval for the draws.
Because of a previous unpleasant construction experience, the Rudolphs expressed to First Southern's Vice President their concern regarding the dangers of advancing funds to a construction contractor and their desire to be protected against the loss of such advanced funds.
The Rudolphs allege, however, that the Vice President assured them that they need not worry about this particular problem because First Southern employed an inspector who would not approve a draw unless the work had been properly performed; and, further, that a portion of their fee to First Southern would be applied to this inspection service.
After the construction began, First Southern issued four of the five draw checks. Alleging they relied solely on First Southern's "approval" of the work done, the Rudolphs endorsed the four checks without conducting independent inspections of the premises. The four draws disbursed to the contractor totalled $15,760.00.
The Contractor defaulted on the construction contract and left unpaid accounts with several materialmen and subcontractors. The City of Mobile Inspection Services Department rejected the work done; and the Rudolphs were forced to expend an additional sum of money to make their home habitable. First Southern withheld the final draw of $3,940.00 for "security," while the Rudolphs have made monthly payments on the entire amount financed since 1978.
The Rudolphs' claims against First Southern, as set out in their complaint, are for negligent inspection of the work performed prior to the authorization of the payments to the Contractor, and for conversion of the final draw. The Rudolphs' motions to consolidate the instant case with an action filed against them by a materialman and to add as a party defendant the Contractor's bonding company were granted by the trial court.
First Southern, with its motion for summary judgment, filed the affidavit of its Vice President, Mr. G.H. Rains, which states:
 "All inspections made on the property of Chester Rudolph and Lyndall Rudolph were for the sole benefit of First Southern Federal Savings and Loan Association.
 "Said inspections were for the specific purpose of determining whether sufficient improvements had been constructed to constitute [security] for its construction loan.
 "No representations were made to the Plaintiffs by First Southern Federal Savings and Loan Association as to the quality of the work performed."
Lyndall Rudolph's affidavit, in opposition to the motion for summary judgment, however, states:
 "My husband and I sought financing from First Southern Federal Savings and Loan and spoke with Mr. Rains. First Southern insisted that our construction contract with Associated Builders be changed so as to be placed on their contract form. . . . Note that Paragraph 5 [of the Bank's contract form] provides that this contract supersedes all other contracts.
 "Prior to my husband and I applying for the loan with First Southern and all during our discussion and contacts with Mr. Rains of First Southern, we mentioned on numerous occasions our concern that our previous bad experience with [another contractor] would repeat itself with Mr. Firth's company. We expressed our concern that we would lose our money to the contractor by his not finishing the job after getting paid or his doing unsatisfactory work and not fixing it. Mr. Rains told us not to worry about these problems because First Southern employed an inspector who would not approve a draw called for on the revised draw schedule unless the work was done and performed properly. He even told us that a portion of the fee we paid First Southern was for the service of First *Page 66 
Southern inspecting the work. I have reviewed the closing statement and it does reflect a $197.00 construction charge."
A supplemental affidavit was later filed by the Rudolphs, which states:
 "After Associated Builders left the job, our house was not in an inhabitable condition. My husband and I spent more than $5,000.00 of our own money, . . . to make the house inhabitable. We have never received the $3,940.00 retained by First Southern Federal Savings and Loan Association even though we have been required to make payments on that full sum."
The trial court granted First Southern's motion for summary judgment, denied the bonding company's motion for summary judgment, and denied the Rudolphs' motion for summary judgment and their motion to alter, amend or vacate the judgment.[1] This appeal followed.
In its motion for summary judgment, First Southern reasserted its defense that all inspections of the Rudolphs' premises had been conducted solely for the benefit of First Southern in order to protect its security interest in that property. The asserted ground for the motion was that First Southern owed no duty to the Rudolphs upon which a claim of negligence could be based because "the law of Alabama does not impose liability on the part of a construction lender to the Plaintiffs for structural defects of warranties by the builder."
The Rudolphs, therefore, state that the primary issue before this Court on appeal is whether, under Alabama law, First Southern owed a duty to the Rudolphs to "use ordinary care in the conduct of its inspections under the circumstances of thisparticular case." (Emphasis supplied.)
On appeal, then, we must determine whether the evidence before the trial court, when considered in a light most favorable to the Rudolphs, supports any one of the Rudolphs' theories of liability, and thus defeats summary judgment.Tolbert v. Gulsby, 333 So.2d 129 (Ala. 1976); ARCP 56 (c).
Before analyzing the authorities cited in support of the parties' respective positions, one further refinement of the issue presented will be helpful. The Rudolphs contend, "under the circumstances of the particular case," that First Southern voluntarily undertook to assume the inspection duties for the Rudolphs' benefit by assuring them "not to worry about these problems because First Southern employed an inspector who would not approve a draw called for on the revised draw schedule unless the work was done and performed properly," for which inspection service they were charged a fee.
In other words, the Rudolphs do not claim, as an abstract proposition, that the normal lender/borrower relationship, even where that relationship includes inspection of the premises by the lender during construction, imposes a legal duty upon the lender to perform inspection services for the benefit of the borrower. Therefore, contend the Rudolphs, the factual posture of the case before the trial court presents a factual issue which precludes disposition by summary judgment. We agree.
The affidavit of First Southern's Vice President, the only evidence in support of its motion for summary judgment, is to the effect that its inspections of the Rudolphs' property were for the sole benefit of First Southern and not for the benefit of the Rudolphs, and that no representations were made to them by First Southern "as to the quality of the work performed." Otherwise stated, Mr. Rains's affidavit, other than expressing a legal conclusion, goes only to representations with respect to the quality of the work performed, and does not constitute a denial of the representation alleged and testified to by Mrs. Rudolph going to the voluntary undertaking by First Southern to conduct periodic inspections for the benefit of the Rudolphs. *Page 67 
Therefore, under the case as here postured, the Rudolphs' evidentiary support of their negligence claim, if legally cognizable, stands uncontradicted. We note further, however, that the Rudolphs did not cross appeal from the denial of their motion for summary judgment.
Initially, we will address the broader issue of whether a duty exists to exercise reasonable care in conducting inspections of a premises, where that issue is posed in the context of a money lender's inspections of the borrower's new construction which is financed by the loan proceeds.
While this precise question is one of first impression, this issue has been treated generally in Alabama in other factual settings; and our decisions employ language similar to that found at Restatement (Second) of Torts, § 324A:
 "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 (a) his failure to exercise reasonable care increases the risk of such harm, or
 (b) he has undertaken to perform a duty owed by the other to the third person, or,
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."
It is a clearly established doctrine in this jurisdiction that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting reasonably, and is liable in damages for injury resulting from a breach of that duty. Dailey v. City of Birmingham, 378 So.2d 728 (Ala. 1979).
Likewise, consistent with the Restatement's expression of the common law rule, a course of dealing which results in a special relationship between the parties can give rise to the duty to use that degree of care and skill which would be reasonably necessary under the circumstances, notwithstanding the specific language which is contained in the document creating the original contractual relationship. Hartford Steam BoilerInspection and Insurance Company v. Pabst Brewing Company, 201 F. 617 (7th Cir. 1912).
In Beasley v. MacDonald Engineering Co., 287 Ala. 189,249 So.2d 844 (1971), in which this Court held that a workmen's compensation carrier that undertook to conduct safety inspections of the employer's premises was required to use due care in conducting those inspections as a duty to third parties (the employees), the Court stated:
 "This state, at least as early as 1911, recognized that `when a person undertakes an employment, which requires care and skill, whether for reward or not, a failure to exert the measure of care and skill appropriate to the measure of such employment is negligence, for which an action will lie.' Parker Bro. v. Hodgson, 172 Ala. 632, 635, 55 So. 818, 819. . . .
". . .
 "As Justice Cardozo said, `It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.' Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425." Beasley, at 287 Ala. 193, 249 So.2d 844.
Most recently, this Court was faced with this issue in the context of those inspections conducted by insurance companies of the thing to be insured for the purpose of fixing the premium rates. In The Ranger Insurance Company v. HartfordSteam Boiler Inspection and Insurance Company, 410 So.2d 40
(Ala. 1982), however, the insurance contract between the parties contained language to the effect that "neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the named insured or others, to determine or warrant that such object is safe or healthful." *Page 68 
The express disclaimer in the insurance contract, then, brought Ranger Insurance within a recognized exception to the common law responsibility stated above,[2] i.e., "no such rule of duty obtains in favor of the assured where the inspections are attributable alone to the policy provision for the sole benefit of the insuror, which would leave no ground for a finding of fact that they were understood between the parties to be made and accepted as inspection service for direct benefit to the [insured]." Pabst Brewing Company, 201 F. at 629.
The Rudolphs, in support of their contentions, have directed this Court's attention to a recent line of cases in other jurisdictions which support their theories of liability against First Southern.
In 1968, the California Supreme Court issued its decision inConnor v. Great Western Savings Loan Association, 69 Cal.2d 850,73 Cal.Rptr. 369, 447 P.2d 609 (1968). Plaintiffs were the purchasers of homes in a residential development, which residences were severely damaged because their foundations were not designed to withstand the expansion and contraction of the adobe soil upon which they were built. In a 4-3 decision, the Court reversed a judgment of nonsuit in favor of defendant Great Western, the supplier of finances for the purchase of the land and for the construction of the homes, and the holder of "first refusal" for the financing of the individual home purchases.
After finding "abundant evidence" that the construction company had negligently constructed the homes "without regard to soil conditions prevalent at the site," the Court then addressed the issue of whether Great Western, while not in privity of contract with Plaintiffs, except as money-lender, owed a greater duty to Plaintiffs and was, therefore, negligent in its dealings with them.
In finding that Great Western was, indeed, negligent and liable to plaintiffs, the Court stated:
 "The fact that Great Western was not in privity of contract with any of the plaintiffs except as a lender does not absolve it of liability for its own negligence in creating an unreasonable risk of harm to them. `Privity of contract is not necessary to establish the existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty.' (Cites omitted.) The basic tests for determining the existence of such a duty are clearly set forth in Biakanja v. Irving, supra, 49 Cal.2d 647, 650, 320 P.2d 16, 19, as follows: `The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to him, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm.'
 "In the light of the foregoing tests Great Western was clearly under a duty to the buyers of the homes to exercise reasonable care to protect them from damages caused by major structural defects.
 "(1) Great Western's transactions were intended to affect the plaintiffs significantly.
 "The success of Great Western's transactions with [construction contractors] depended entirely upon the ability of the parties to induce plaintiffs to buy homes in the [development] and to finance the purchases with funds supplied by Great Western. Great Western's agreement to supply funds [to the contractor] was on *Page 69 
condition that a sufficient number of persons first made commitments to buy homes. Great Western agreed to warehouse land for [the contractor] on the understanding that the land would be used for a residential subdivision. Great Western also stipulated that advances from its construction loans would be used by [the contractor] to exercise repurchase options, thereby affording Great Western the opportunity for a $30,000 capital gain. Finally, Great Western took steps to have [the contractor] channel buyers of homes to its doors for loans, extracting a 1 percent loan fee from [the contractor] in the process.
 "(2) Great Western could reasonably have foreseen the risk of harm to plaintiffs.
 "Great Western knew or should have known that [the contractors had never] developed a tract of similar magnitude . . . [and that the contractor] was operating on dangerously thin capitalization, creating a readily foreseeable risk that it would be driven to cutting corners in construction. That risk was enlarged still further by the additional pressures on [the contractor] ensuing from its onerous burdens as a borrower from Great Western.
"(3) It is certain that plaintiffs suffered injury.
". . .
 "(4) The injury suffered by plaintiffs was closely connected with Great Western's conduct.
 "Great Western not only financed the development of the [residential tract] but controlled the course it would take. Had it exercised reasonable care in the exercise of its control, it would have discovered that the pre-packaged plans purchased by [the contractor] required correction and would have withheld financing until the plans were corrected.
 "(5) Substantial moral blame attaches to Great Western's conduct.
". . .
 "(6) The admonitory policy of the law of torts calls for the imposition of liability on Great Western for its conduct in this case. Rules that tend to discourage misconduct are particularly appropriate when applied to an established industry." Connor, at 73 Cal.Rptr. 377, 378, 447 P.2d 617, 618.
While the Connor decision appeared to take the liability of the money lender to a far-reaching, new limit, we find that subsequent judicial and legislative actions have tended to limit Connor to its facts.
In Bradler v. Craig, 79 Cal.Rptr. 401, 274 Cal.App.2d 466
(1969), the Court of Appeal, in affirming a summary judgment for defendant contractor and defendant money lender, engaged in a lengthy analysis of Connor and quoted with approval that portion of the Connor majority opinion dealing with the "privity of contract" issue and the standard to be applied in determining whether the requisite duty exists. That Court, however, went on to hold:
 "[The lending company's] alleged participation was that of the usual and ordinary construction and purchase money lender, content to lend money at interest on the security of real property. Approval of plans and specifications, and periodic inspection of houses during the construction is normal procedure for any construction money lender. . . . Unlike Connor, its financing did not take on `ramifications beyond the domain of the usual money lender.' [Connor, 73 Cal.Rptr. at 376, 447 P.2d at 616.] Unlike Connor, it was not financing the development of a large tract wherein it sought to receive substantial fees for making construction loans. Unlike Connor, it did not receive a fee for `warehousing' the land. Unlike Connor, it received no guarantee from loss of profits in the event a home buyer sought permanent financing elsewhere. Unlike Connor, it was not `preoccupied with selling prices and sales.' [Connor, 73 Cal.Rptr. at 374, 447 P.2d at 614.]" Bradler v. Craig, 79 Cal.Rptr. at 407.
In Callaizakis v. Astor Development Co., 4 Ill. App.3d 163,280 N.E.2d 512 (1972), a class action was instituted by condominium *Page 70 
purchasers alleging negligent inspection by the savings and loan company of the premises while under construction. The appellate court affirmed the lower court's dismissal of the savings and loan association as a party defendant, because there were no allegations which would show that the association's alleged inspection activities were conducted for the benefit of the plaintiffs, or that they were made for purposes other than those of the usual money lender.
After a lengthy discussion of Connor and its six-factor standard, the Illinois appellate court noted that the plaintiffs had alleged that "virtually every aspect held to be important [in Connor] was either actually present or probably present in [this defendant contractor's] participation in the [development]," and asked that the court "safely assume" certain things about the defendant.
The Court answered by holding:
 "We must determine whether these facts may be reasonably inferred from the facts actually alleged in the complaint so as to be of relevance in determining whether the complaint states a cause of action. . . .
 "We do not believe that the rationale of Connor
should be expanded to meet the facts alleged in the amended complaint. To do so would possibly effect `a drastic restructuring of traditional economic relationships' as Justice Mosk stated in his dissent in Connor [73 Cal.Rptr. at page 382], 447 P.2d at page 622.
 "The California legislature has taken a similar view. The majority opinion in Connor characterized Great Western's activities as taking on `ramifications beyond the domain of the usual money lender.' (Cite omitted.)
 "A statute passed by the California legislature (West's Ann.Civ. Code § 3434) after the Connor
decision incorporates the above phraseology:
 "`A lender who makes a loan of money, the proceeds of which are used or may be used by the borrower to finance the design, manufacture, construction, repair, modification or improvement of real or personal property for sale or lease to others, shall not be held liable to third persons for any loss or damage occasioned by any defect in the real or personal property so designed, manufactured, constructed, repaired, modified or improved or for any loss or damage resulting from the failure of the borrower to use due care in the design, [etc.] of such real or personal property, unless such loss or damage is a result of an act of the lender outside the scope of the activities of a lender of money . . .'"
Callaizakis, at 280 N.E.2d 516, 517.
For subsequent decisions similarly limiting Connor, seeArmetta v. Clevetrust Realty Investors, 359 So.2d 540 (Fla.App. 1978); Murry v. Western American Mortgage Co., 124 Ariz. App. 387,604 P.2d 651 (1979).
Another decision wherein plaintiffs alleged liability of a money lender for negligent inspection of a construction site isRice v. First Federal Savings and Loan Association of LakeCounty, 207 So.2d 22 (Fla.Dist.Ct.App. 1968). In that case, notwithstanding the money lender's deducting from the loan proceeds an "inspection and supervision fee" and its periodic inspections of the construction site, the appellate court, rejecting the owners' claim, held:
 "The effect to be given to an alleged implied contract is that effect which the parties as fair and reasonable men presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had expressly contracted in reference thereto. Bromer v. Florida Power Light Co., Fla. 1950, 45 So.2d 658, 660, 13 A.L.R.2d 1227. It would be unreasonable to infer merely from [the savings and loan company's] deduction of an inspection fee a contractual duty to [plaintiffs] to perform such inspection on their behalf. As the court below aptly stated:
 "`A lender of construction money has an interest in the progress and quality of the construction of its security proportional to the amount of money invested and would reasonably be expected *Page 71 
to inspect the construction and be entitled to additional compensation for its additional costs in making such inspection.'"
Rice, at 207 So.2d 23.
Whether this Court, if faced with the Connor facts, would follow the Connor precedent we need not decide. We emphasize, however, that the Connor decision, while opening new doors of litigation, was a 4-3 decision (with strong dissenting opinions filed), and has been critically limited by subsequent judicial decisions and legislative enactment.
We note further that Connor dealt with extreme facts — facts which disclose that the lender was in virtually complete control of the entire construction project — a relationship with the purchasers far beyond that of the traditional role of a lender.
For purposes of the instant case, we align ourselves with those cases that restrict Connor to its extreme facts. We hold that no duty is imposed upon a lender of a construction loan to exercise reasonable care in its inspection of the borrower's premises, even where the borrower pays the lender's inspection fee, unless the lender voluntarily undertakes to perform such inspection on behalf of and for the benefit of the borrower.
The mere relationship of lender/borrower, including the lender's right of inspection at the borrower's cost, does not, of itself, give rise to a duty of due care to the borrower in the lender's exercise of that right. (For the application of an analogous principle, see Ranger Insurance, supra.) But this principle does not prohibit the lender from voluntarily assuming a special relationship whereby the lender undertakes to perform the function of inspecting the borrower's property for the borrower's benefit.
Because the lender may exercise its independent right of inspection for its exclusive benefit, and thus incur no liability to the borrower for its negligent inspection, the burden is on the borrower, seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender.
This burden of proof is met only when the evidence reasonably supports an inference of fact to the effect that the lender, either affirmatively or through a course of conduct, assumed the function of inspection expressly, though not necessarily exclusively, for the benefit of the borrower. Given the element of duty, of course, the borrower must further prove its breach, either through misfeasance or malfeasance, as well as resultant damage.
Applying the above-stated principles to the instant facts, we find that the trial court erred in granting summary judgment. Before any contact with First Southern, the Rudolphs had entered into a construction contract with the builder (using a standard A.I.A form), which provided for payment by a system of draws, approved by an architect after his inspection of the premises. When First Southern conditioned its loan upon the execution of its contract, eliminating the architect's approval safeguard, the Rudolphs related to the lender their past experience in which they had been the loser in a similar situation. To this expression of concern over the elimination of the inspection safeguard, First Southern's vice president told them not to worry and assured them that First Southern had its own inspector who would not approve a draw called for under the revised draw schedule until the work was performed properly. Certainly, this is ample evidence, if believed by the factfinder, to reasonably support an inference that First Southern voluntarily and affirmatively assumed the undertaking to inspect the subject property for the Rudolphs' benefit.
Under these particular circumstances, the factfinder would be authorized to conclude that Mr. Rains's statement to the Rudolphs was not just a casual reference to First Southern's benefit, or that the inspection fee was not intended to be limited to services rendered exclusively for First Southern's benefit. *Page 72 
This evidence lends itself to a reasonable inference that Mr. Rains's statements were intended as assurances to the Rudolphs that First Southern's inspection service, by which the revised draw schedule would be controlled, was a viable substitute for the architect's approval safeguards contained in the former contract, and that the new inspection safeguards were intended to inure to the benefit of the Rudolphs.
In conclusion, we observe that there is considerable confusion in the record with respect to the Rudolphs' claim against First Southern for conversion. First Southern's motion for summary judgment did not encompass this issue and the trial court's grant of summary judgment, as supplemented by its 54 (b) order, is limited to the negligent inspection claim, without any reference, however, to the conversion claim. This anomaly was recognized by the Rudolphs' counsel in a post-judgment motion, asking the court to "amend its order so as to clearly state that the summary judgment entered is with respect only to First Southern's liability for negligent inspection." Then, the court entered its order, reciting "that Plaintiffs' [motion to amend] be, and the same is hereby denied by agreement." Though undisclosed by the record, we suspect that the "agreement" referenced in the court's order is pursuant to averments contained in First Southern's answer that it is holding $3,940.00, the unpaid portion of the loan, and offering to "apply such principle sum in such manner as the court may deem appropriate, or continue to hold the same pending a disposition of this cause."
While an agreement of the parties, as well as responsive pleadings, not reduced to a court order, do not constitute an adjudication of a pending claim, we are confident in the instant case — particularly in view of our remand of the negligent inspection claim for trial — that the conversion claim, or the agreement of the parties with respect thereto, is still before the trial court for appropriate disposition.
REVERSED AND REMANDED.
TORBERT, C.J., and FAULKNER, ALMON, EMBRY, BEATTY and ADAMS, JJ., concur.
MADDOX, J., not sitting.
SHORES, J., recuses.
[1] This order left pending asserted claims against all other named parties defendant, but was rendered final pursuant to ARCP 54 (b), so as to support an appeal. While the record is not entirely clear as to the claim for conversion, we have treated the order as a final judgment for purposes of this appeal. This point is discussed later in the opinion.
[2] While Ranger Insurance uses the term "exception to the rule" (and this is because it is so expressed in the authorities relied upon), we recognize that, in the purest sense, its holding of no liability is not an "exception"; rather, theRanger Insurance facts, as well as the Pabst Brewing facts, do not invoke the operative effect of the "gratuitous undertaking" doctrine.