**In the Matter of SHERWOOD DIVERSI-FIED SERVICES, INC., Debtor.**

**No. 73 B. 213.**

United States District Court,
S. D. New York.

Oct. 4, 1974.

**1360**

Weil, Gotshal & Manges, by Harvey R. Miller, Bruce R. Zirinsky and Craig W. Friedrich, New York City, for debtor.

Louis J. Lefkowitz, Atty. Gen., by A. Seth Greenwald, Asst. Atty. Gen., for claimant.

## OPINION

WERKER, District Judge.

On April 23, 1974, the Honorable Asa S. Herzog, Bankruptcy Judge, entered an Order expunging a priority claim [1] filed by the New York State Tax Commission ("Tax Commission") in the amount of $1,350,870.56 [2] for sales and/or compensating use tax allegedly owed by Sherwood Diversified Services, Inc. ("Sherwood"), the debtor in possession. The Bankruptcy Judge concluded that Sherwood was in the business of financing the purchase of machinery and equipment by third parties from manufacturer-vendors, and that Sherwood, as a financing agency, had no responsibility to collect sales tax. The Tax Com-

mission appeals from the Order expunging its priority claim.

For the purpose of this appeal, this Court adopts the description of Sherwood's business activities as set forth on pages 2 and 3 of the Bankruptcy Judge's Opinion:

The debtor commenced operations in 1961 as Sherwood Leasing Corporation, engaged in the business of financing the purchase by third parties of machinery and equipment from manufacturer-vendors. Although its business became diversified over the succeeding years, the debtor continued its financing operations and it is those operations which are the basis of the present controversy. The financing transactions arose in this manner:

Persons desirous of purchasing equipment or machinery, who were unable to finance the transactions themselves, or unable to obtain bank financing, applied to the debtor for a loan in order to effect the purchase. If debtor was satisfied with the nature of the transaction, the responsibility of the purchaser and the character of the collateral, it made a commitment to advance the money necessary for payment to the manufacturer-vendor of the purchase price plus applicable sales tax. The equipment was shipped by the vendor directly to the purchaser and the invoice sent to the debtor. The debtor thereupon entered into a security agreement with the purchaser which took the form of a document characterized as an "equipment lease," * and upon advice from the purchaser that the equipment had been received in good condition, debtor remitted the full purchase bill plus any applicable sales tax to the manufacturer-vendor. Concurrently with the execution and delivery of the

---

1. The priority is asserted under section 64 of the Bankruptcy Act, 11 U.S.C. § 104 (1970).

2. The Tax Commission amended its original claim and is now claiming the sum of

$1,187,466.37. Of this amount, $1,102,146.54 is for sales tax, $750 for compensating use tax, and $84,569.63 for interest.

aforesaid "equipment lease," U.C.C. financing statements were executed and delivered to the purchaser and filed by the debtor.

The monthly payments called for by the "equipment lease" were calculated to return to the debtor over the term of the agreement: (1) the purchase price, (2) sales tax or other charges paid at the time of the purchase from the manufacturer-vendor, (3) interest on the moneys advanced, and (4) filing fees.

The purchaser, who was characterized in the agreement as a "lessee" was given an option to purchase the equipment at the end of the term of the agreement for a nominal consideration of $1.00 to $10.00.

In some instances there were sale and lease-back arrangements in which the debtor entered into the financing transaction after the borrower had already purchased the equipment from the manufacturer-vendor and had obtained delivery thereof. In these situations, where the State of New York was involved, the purchaser of the equipment paid all applicable sales tax to the manufacturer-vendor at the time of the purchase of the equipment.

\* The form of the financing documentation, that is, the so-called "equipment lease," remained essentially the same from 1961 to the date of the petition for an arrangement herein.

The initial question to be answered on this appeal is whether the "equipment leases" were in fact true leases or simply financing agreements. Under § 1105(a) of the New York Tax Law (McKinney's Consol.Laws, c. 60, 1966) [hereinafter cited as "Tax Law"], a tax

3. Section 1101(b)(5) of the Tax Law reads: "Sale, selling or purchase. Any transfer of title or possession or both, exchange or barter, rental, lease or license to use or consume . . . ."

4. See Tax Law, Sections 1133(a), 1132(a), 1131(1), 1101(b)(8).

5. Hawkland, The Impact Of The Uniform Commercial Code on Equipment Leasing,

is imposed on retail sales of tangible personal property in New York State. For the purposes of the Tax Law, a true lease constitutes a sale,[3] and the seller has the responsibility of collecting the tax and remitting it to the state.[4]

Section 1–201(37) of the New York Uniform Commercial Code (McKinney 1964) draws a distinction between a true lease and a lease intended as security:

> "Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The evidence adduced during the proceedings below shows that in substantially all of the transactions between Sherwood and its customers, nominal purchase options of from $1.00 to $10.00 were given to the purchaser-lessees. See Transcript of Adjourned Hearing on Objections to Claim of State of New York (No. 1608), February 15, 1974, at 7 [hereinafter cited as "Transcript"]. The importance of the options is emphasized by Professor Hawkland:

> UCC section 1–201(37) makes it clear that an intention of the parties test is the appropriate one to distinguish true leases from leases intended as security, and that the presence or absence of an option to purchase is a strong factor in determining that intention.[5]

1972 University of Illinois Law Forum 446. One Bankruptcy Judge has noted that "Just as calling an agreement 'a lease' does not make it a lease (as the trustee shall hereafter agree), reference by counsel to a writing as 'security agreement granting security interest' does not make it such, either in fact or in law. Whether a lease is intended as security is to be determined by the facts of each case." In re Universal Medical Serv.

Both the Bankruptcy Judge in his Opinion and Sherwood in its brief cite numerous authorities in support of the test outlined in section 1–201(37).[6] The Tax Commission seeks to avoid the thrust of Sherwood's argument by pointing to the boilerplate provisions of the equipment leases. Mr. Max Mulberg, who conducted an audit of Sherwood's financial records,[7] concluded that Sherwood was in the leasing business because:

> "[T]he agreement is entitled "Equipment Lease"; with the parties known as lessor and lessee, and also stipulated monthly lease rentals.
>
> In addition the lease agreement states, paragraph 7, that the equipment shall at all times remain the property of the lessor, and that at the expiration of the lease the lessee shall return the equipment unencumbered to the lessor."

Transcript at 27.

Mr. Mulberg had adopted the same position during his own deposition:

Q. Mr. Mulberg, is it your position that if a contract refers to, and use [sic] the terminology lease, lessor, lessee, monthly rental, it therefore is in fact a lease for the purpose of the State sales tax.

A. That's correct.

Deposition of Max Mulberg, February 4, 1974, at 59 [hereinafter cited as Mulberg deposition].

■ The Tax Commission would have this Court look to the "four corners" of the lease and conclude that the intent of the parties was to enter into a true lease transaction, and not a financing agreement. The overwhelming weight of judicial authority and the language of section 1–201(37) necessitate a rejection of this approach. All of the "facts of each case" must be examined to determine the intention of the parties, and the Court may properly consider "factors outside of the lease as well as the contents of the lease itself . . . ."[8]

Inc., 8 U.C.C.Rep. 614, 616 (E.D.Pa.1970). See also, Penden, The Treatment Of Equipment Leases As Security Agreements Under The Uniform Commercial Code, 13 William & Mary L.Rev. 110 (1971); Note, Recording of Equipment Leases: A Proposed Amendment To The Uniform Commercial Code, 47 Notre Dame Law. 993 (1972).

For a discussion of several aspects of equipment leasing see Hawkland, *supra*; Shapiro, The ABC's Of Leasing, *Id.* at 433; Baskes, Tax Planning For Lease Transactions, *Id.* at 482; Wyatt, Accounting For Leases, *Id.* at 497. The Tax consequences of classifying leases as security interests are discussed in Rev.Ruling 72–408, 1972–2 Cum. Bull. 86.

6. In re Leasing Consultants, Inc., 13 U.C.C. Rep. 189 (2d Cir. 1973), aff'g 351 F.Supp. 1390 (E.D.N.Y.1972); Witmer v. Kleppe, 469 F.2d 1245 (4th Cir. 1972); In re Walter W. Willis, Inc., 440 F.2d 995 (6th Cir. 1971); In re Delta Food Processing Corp., 13 U.C.C.Rep. 563 (N.D.Miss.1973); In re New Hope & Ivyland Railroad Co., 353 F. Supp. 608 (E.D.Pa.1973); Dynalectron Corp. v. Jack Richards Aircraft Co., 337 F. Supp. 659 (W.D.Okla.1972); In re Brothers Coach Corp., 9 U.C.C.Rep. (E.D.N.Y.1971); In re Virginia Air Conditioning Co., Inc., 11

U.C.C.Rep. 1260 (W.D.Va.1972); In re Vaillancourt, 7 U.C.C.Rep. 748 (D.Me.1970); Leasco Data Processing Equipment Corp. v. Starline Overseas Corp., 74 Misc.2d 898, 346 N.Y.S.2d 288 (App. Term. 1st Dept. 1973); Granite Equipment Leasing Corp. v. Acme Pump Co., 13 U.C.C.Rep. 707 (Conn.Sup. Ct.1973); Crowder v. Allied Investment Corp., 12 U.C.C.Rep. 1261 (Neb.Sup.Ct. 1973); Uniroyal, Inc. v. Michigan Bank, N. A., 12 U.C.C.Rep. 745 (Mich.Cir.Ct.1972); Peco Inc. v. Hartbauer Tool & Die Co., 262 Ore. 573, 500 P.2d 708 (1972); James Talcott, Inc. v. Franklin National Bank of Minneapolis, 292 Minn. 277, 194 N.W.2d 775 (1972); Nickell v. Lambrecht, 29 Mich.App. 191, 185 N.W.2d 155 (Ct.App.1970).

7. The audit was based on two test quarters, June 1, 1971 to August 31, 1971 and June 1, 1972 to August 31, 1972. Such test checking is valid if "the method adopted is reasonably calculated to reflect the taxes due." W. T. Grant v. Joseph, 2 N.Y.2d 196, 206, 159 N.Y.S.2d 150, 157, 140 N.E.2d 244, 249 (1957).

8. In addition to the "equipment lease" several other documents were included in each transaction: the option to purchase; a financing statement; an invoice from the manufacturer to Sherwood; an "Equipment

In re Leasing Consultants, Inc., 486 F.2d 367, 373 (2d Cir. 1973), quoting In re Walter Willis, Inc., 313 F.Supp. 1274, 1278 (N.D.Ohio 1970), aff'd 440 F.2d 995 (6th Cir. 1971).

The Tax Commission also argues that even if this Court finds that the intention of the parties was to create a security interest, the provisions of the Sales Tax Law would still apply. The Tax Commission's argument can be summarized as follows: if the leases were in fact intended as security, then the transactions between Sherwood and its customers were conditional sales,[9] with Sherwood retaining a security interest in the collateral; since a conditional sale is in fact a "sale," then Sherwood had the responsibility to collect sales tax from its customers.[10] The viability of this argument, of course, depends upon whether Sherwood can be characterized as a "seller."

Sherwood argues that it was not a "seller," but merely a financing agency,[11] and as such it never "purchased" the equipment from the manufacturer-vendors, or "sold" it to the purchaser-lessees. To Sherwood, the equipment leases were security agreements whereby Sherwood received a security interest[12] in the equipment to secure the advances made to the purchaser-lessees.

The Uniform Commercial Code, § 2–104(2) defines a "financing agency" as:

"[A] bank, finance company or other person who in the ordinary course of business makes advances against goods or documents of title or who by arrangement with either the seller or the buyer intervenes in ordinary course to make or collect payment due or claimed under the contract for sale, as by purchasing or paying the seller's draft or making advances against it or by merely taking it for collection whether or not documents of title accompany the draft. 'Financing agency' includes also a bank or other person who similarly intervenes between persons who are in the position of seller and buyer in respect to the goods. (Section 2—707)."

Sherwood, if acting as a financing agency, would not be considered a buyer or seller of the goods. The pivotal issue, then, is to determine whether Sherwood was acting as a financing agency or as a seller. This Court agrees with the Bankruptcy Judge that the proper

---

Lease Acceptance Notice," and a "Lease Assignment and Security Agreement."

Apparently, Mr. Mulberg was made aware of the existence of all the documents. The Tax Commission, on cross-examination of Mr. Russo, Sherwood's president, asked:

"Q. Did you present any of this type of evidence [the documents described above], claimed evidence at that time [of the audit]?

A. Oh, yes. As a matter of fact while I pointed out those documents, they were readily available to that auditor [Mr. Mulberg] because they appear in each individual file that was examined by the auditor." Transcript at 16–17.

9. "Leases intended as security fall directly within the scope of Articles 9 (secured transactions) and 2 (sales) because they are deemed to be sales of equipment with a reservation of title to provide security." Hawkland, *supra*, at 446.

10. Mr. Mulberg testified that Sherwood should not have paid sales tax to the manu-

facturers-vendors, since the purchases were made in contemplation of resale. He asserted that Sherwood should have applied for a resale exemption certificate. Transcript at 28.

11. The following exchange occurred between the Court and Mr. Anthony Russo, president of Sherwood:

"THE COURT: Did they [Sherwood] buy property for the purpose of reselling, or were they in the financing business; which was it?

THE WITNESS: In the financing business. The contemplation of resale or use on your [our] own behalf never occurred." Transcript at 21.

12. Under the Uniform Commercial Code, a secured party is broadly defined as "a lender, seller or other person in whose favor there is a security interest . . . ." N. Y.U.C.C. § 9–105(i) (McKinney 1964). The definition is not restricted to "sellers."

method for analyzing the transactions in question is to "look through" the form of the agreement and to examine the intent of the parties and the facts and circumstances which existed at the time of the agreements.[13]   Pursuant to this approach, the following factors become pertinent:   (1) the equipment ordered by the purchaser-lessees was shipped directly to them by the manufacturer-vendors;   (2) Sherwood would remit the full sales price plus any applicable sales tax to the manufacturer-vendors;   (3) the purchaser-lessees had often placed purchase orders with the manufacturers-vendors prior to approaching Sherwood for financing;   (4) Sherwood did not select or inspect any of the equipment;   (5) the lessees were given options to purchase the equipment for nominal sums, usually from $1.00 to $10.00;   (6) U.C.C. financing statements were executed and delivered to the lessees and filed by Sherwood;   (7) the agreements were almost always discounted with a bank or other lending institution;   (8) the monthly payments under the lease were calculated to return to Sherwood the purchase price, sales tax, interest and filing fees;   (9) Sherwood does not maintain a warehouse for the storage of machinery and equipment;   (10) Sherwood did not carry the leased property as assets on its books but rather as accounts receivable;   (11)

Sherwood did not take any depreciation deductions on the equipment;  and (12) Sherwood has never taken possession of any of the leased equipment at the end of the leased term.

The combined effect of these factors supports not only the conclusion that the equipment lease transactions were security agreements, but also the fact that Sherwood was a "financing agency" and not a "seller" of the equipment.   As such, Sherwood had no responsibility to collect sales tax.[14]

As a final point, the Tax Commission argues that Sherwood owes $750 plus interest in compensating use tax for personal property leased from its landlord, Metromedia.[15]   The lease provided that Metromedia would make available to Sherwood certain leasehold improvements, fixtures and equipment. It was Mr. Mulberg's conclusion that 10% of the $125,000 rental agreement "was for tangible personal property and thus subject to a compensating use tax." Mulberg Deposition at 78.

Mr. Mulberg also testified as to the following: the 10% figure was an estimate, "an approximation";   Sherwood had vacated the premises, so no inspection was ever made;  he did not know what equipment was on the premises, or the amount of space rented by Sherwood, or the amount of rent per square

13. See Rev.Rul. 55–542, 1955–2 Cum.Bull. 59;  Rev.Rul. 55–540, 1955–2 Cum.Bull. 39. In Shapiro v. Union Bank and Savings Company, 458 F.2d 938 (7th Cir. 1972), the bank which was characterized in a security agreement as a "seller-secured" party, tried to reclaim goods from a bankruptcy sale. The Court "looked through" the form of the agreement and held that the bank was a "financing agency" and "[could not] exercise the seller's right of reclamation and thus circumvent entirely the filing requirements of Article 9." Id. at 941.

14. The Bankruptcy Judge noted, but did not rely on, the fact that the State is seeking to be paid twice.  I agree.  Sherwood's payments to the manufacturer-vendors included any applicable sales tax.  If, as the State argues, Sherwood purchased for resale, then Sherwood was mistaken in paying sales tax to the manufacturer-vendors.  Sherwood

should have given the manufacturers a resale exemption certificate.  Tax Law § 1132(c), and then collected sales tax from the purchaser-lessees.  The tax collected would be equal to the tax paid to the manufacturers (assuming no sales tax would have to be paid on interest, see Deposition of Emile Gentile, February 4, 1974, at 15). Thus, any refund or credit due Sherwood would equal the tax owed.  I also agree with the Bankruptcy Judge that there is no need to pursue this point since I have concluded that the equipment leases were security agreements and not sales.

15. See Tax Law § 1110 for a description of the compensating use tax.
 The Tax Commission also claims that the Bankruptcy Judge was "hopelessly prejudiced" against its claim.  The record reflects the complete lack of merit in this argument.

foot. More importantly, Mr. Mulberg admitted that a figure of 7½% or 15% could just as easily have been used as 10%. Mulberg Deposition at 77–81. Based on this testimony, it is the Court's conclusion that the $750 assessment was arbitrarily made, with little or no factual support, and must therefore be expunged.[16]

The Order of the Bankruptcy Judge is affirmed.

So ordered.

16. The State contends that the Bankruptcy Judge totally ignored the $750 assessment in expunging the entire claim. Although the Bankruptcy Judge made no specific finding of fact on the $750 claim, the record on this appeal is sufficient to enable this Court to make its decision. While it is true that § 1138 of the Tax Law allows the Tax Commission to determine the tax owed "from such information as may be available," and if necessary from estimates based on external indices, the Tax Commission cannot be wholly arbitrary. In re L. Gandolfi & Co., 42 F.Supp. 706, 707 (S.D.N.Y.1940). In *Gandolfi*, the Court commented on the assessment of a sales tax by the City Comptroller: "The Sales Tax Law allows the Comptroller to reach a determination largely arbitrary but nevertheless requires some basis for his finding either 'external indices such as the number of persons employed, rentals, stock on hand and or other factors.' The testimony before the referee is bare of a statement or explanation of any factor whatever employed by the City in determining the amount of sales made by the Cella Company and claimed to be taxable. *They may just as well have guessed eighty percent as fifteen.* This finding cannot be sustained because there is no evidence whatever to sustain it, and the determination of any tax thereon is reversed." *Id.* at 707–708 (emphasis added). In the case on appeal, Mr. Mulberg admitted that he could have used 7½% or 15% as well as 10% to estimate the use tax owed. Mulberg Deposition at 81.