**SOGELEASE CORPORATION, Plaintiff,**

v.

**McGEHEE PUBLISHING COMPANY, INC., d/b/a One Hour Photo Lab; James P. White, Sr.; and First National Bank of McGehee, Defendants.**

**No. PB–C–85–558.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Aug. 26, 1988.

C. James Kubicek, Little Rock, Ark., for plaintiff.

William W. Benton, Pine Bluff, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

Plaintiff brings this action for recovery of the unpaid balance it claims McGehee Publishing Company, Inc., owes under the terms of a Security Agreement and Conditional Sales Contract entered into by the parties on August 29, 1984. Upon agreement of the parties, this case was tried to the Court, without the intercession of a jury, on June 8, 1988, in Hot Springs, Arkansas. The Court now renders its decision in the matter.

This is a diversity case. Plaintiff is a corporation organized under the laws of the state of Delaware, with its principal place of business in New York City, New York. It is a wholly-owned subsidiary of Societe Generale, a banking institution headquartered in Paris, France. Defendant McGehee Publishing Company, Inc., is an Arkansas corporation with its principal place of business in Desha County, Arkansas. Defendant James P. White, Sr., is a resident of Desha County, Arkansas. Defendant First National Bank of McGehee is a national banking association with its principal place of business in Desha County, Arkansas. The amount in controversy exceeds $10,000.00, so this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

On August 29, 1984, Jim Grahn, a sales representative for The KIS Corporation (KIS), contacted defendant White, president of McGehee Publishing Company, Inc. (McGehee), about purchasing a Photokis mini-lab. This product, manufactured by KIS, rapidly develops and processes rolls of film. Relying on representations made by Grahn concerning the profit-making ability of the equipment, White agreed to make the purchase. Grahn produced a "Security Agreement and Conditional Sales Contract" form which bore plaintiff's name and logo. White signed this document, along with a personal guaranty which also bore plaintiff's name and logo. In addition, White signed a KIS customer order form which purportedly contains contractual terms on the reverse side, but a copy of the reverse side was not introduced into evidence. McGehee made a down payment of $1816.60, leaving an unpaid balance of $34,589.08. McGehee's total obligation, or time balance payable, was $48,293.40, which was to be paid in sixty monthly installments beginning January 14, 1985.

The equipment was delivered to McGehee in November 1984, but neither McGehee nor White made any of the installment payments. White testified that the equipment was in operation for four or five months, but McGehee stopped using it when it did not make enough money to meet expenses. Plaintiff took possession of the equipment in March 1986. By a letter dated October 3, 1986, plaintiff's counsel notified White and his counsel that the equipment would be sold at a private sale "at any time after November 3, 1986." On December 15, 1986, plaintiff sold the equipment to KIS for $14,412.80. This amount was credited to McGehee's balance payable, leaving an outstanding balance of $27,880.60.[1] Neither McGehee nor White have made any payments to plaintiff, so plaintiff brings this action seeking to recover $48,293.40, which is the full amount owed by McGehee.

Plaintiff has also named as a defendant the First National Bank of McGehee, ask-

---

1. Obviously, $14,412.80 from $48,293.40 leaves $33,880.60, and this discrepancy was discussed at trial during the testimony of plaintiff's representative, Barry C. Alpert. The difference was attributed to a typographical error. Alpert testi- fied that he would accept $27,880.60, and that he would not seek the higher amount. The Court will therefore accept $27,880.60 as the amount in controversy.

ing that the Court declare plaintiff's interest in the collateral superior to any claim the bank may make pursuant to a financing statement and security agreement filed with the Arkansas Secretary of State. This issue, however, was not mentioned at trial, and the parties have not discussed it in the briefs submitted to the Court.

It appears that this case presents three basic issues for consideration: (1) whether plaintiff and KIS are related entities, (2) whether Grahn was acting as plaintiff's agent, and (3) whether the sale of the equipment was "commercially reasonable" under § 9–504(1)(c) of the Uniform Commercial Code (UCC). Under the terms of the Security Agreement and Conditional Sales Contract, the laws of the state of New York govern this action.

## I. THE RELATIONSHIP BETWEEN PLAINTIFF AND KIS

Defendants, in their original answer, stated a belief that plaintiff and KIS are related entities. White continued to express this position in his testimony at trial. The bases for this belief seem to be (1) that Grahn was carrying plaintiff's financing forms when he contacted White, and that Grahn stated "my company will handle the financing;" (2) that the Security Agreement and Conditional Sales Contract refers to plaintiff as the "seller;" and (3) Grahn's testimony that, at the time he began working for KIS, he was told that the "owner" of KIS was on the board of directors of Societe Generale, plaintiff's parent organization, and that there was "a sort of brother-in-law relationship" between KIS and plaintiff.

■ This relationship is important because if the two are so closely associated as to be, in effect, one entity, plaintiff would be in the position of a seller of goods, and Chapter 2 of the UCC would apply. If, on the other hand, plaintiff and KIS are not considered a single entity, and plaintiff is found to be only a secured party, Chapter 9 of the Code would apply to

this case. The Court finds that the latter view is correct.

■ The Court sees no significance in the fact that Grahn possessed plaintiff's forms. Grahn testified that he carried forms for several finance companies in order to expedite the financing of equipment he sold. Grahn also testified that he did not specifically remember saying "my company will handle the financing," but that if he did say it, he meant only that KIS had means of financing available through finance companies. The Court accepts this explanation as being true, and Grahn's alleged statement in no way establishes a connection between plaintiff and KIS other than a normal business relationship.

■ Next, the Court must consider the designation of plaintiff as "seller" in the Security Agreement and Conditional Sales Contract. McGehee is designated as "buyer" in the agreement. Plaintiff contends that, under New York law, the designation of a finance agency as a "seller" in a security agreement does not affect its status under the UCC.

Section 2–103 of the UCC defines "seller" as "a person who sells or contracts to sell goods." [2] Section 2–104 of the UCC defines a "financing agency" as:

> ... a bank, finance company, or other person who in the ordinary course of business makes advances against goods or documents of title or who by arrangement with either the seller or the buyer intervenes in ordinary course to make or collect payment due or claimed under the contract for sale, as by purchasing or paying the seller's draft or making advances against it or by merely taking it for collection whether or not documents of title accompany the draft.

In order to determine whether plaintiff was acting as a seller or as a financing agency, the Court must "look through" the form of the security agreement and examine the intent of the parties and the circumstances which existed at the time of the

**2.** In this opinion, quotations from the UCC are taken from Ark.Code Ann. §§ 4–1–101 *et seq.* (1987). However, the UCC will be cited without reference to any particular statutory compilation.

agreement. *In re Sherwood Diversified Services, Inc.*, 382 F.Supp. 1359 (S.D.N.Y. 1974). Plaintiff contends, and the testimony showed, that plaintiff does not sell, manufacture, or contract to sell goods of any kind, and it employs no salesmen. It only provides financing for the purchase of goods. The Court has no difficulty in concluding that plaintiff is a financing agency, and not a seller under the UCC. It is apparent that the word "seller" was used merely as a convenience in the preparation of the agreement.

■ Finally, Grahn's testimony concerning his understanding of the relationship between plaintiff and KIS has been adequately refuted. Barry C. Alpert, a senior vendors program officer for plaintiff, testified that he knows the officers and directors of Societe Generale, and that Societe Generale and KIS have no common officers or directors.

The Court finds that plaintiff and KIS are separate entities and that plaintiff was acting only as a financing agency in the transaction at issue.

## II.  GRAHN'S STATUS AS PLAINTIFF'S AGENT

White contends that Grahn was acting as an agent for plaintiff and that plaintiff is therefore liable for misrepresentations Grahn allegedly made which induced White to purchase the KIS equipment. According to White, Grahn misrepresented the following information: (1) that KIS would remove the equipment upon request following a trial period, (2) that the equipment would produce enough income to meet expenses by developing as few as five rolls of film per day, and (3) that Grahn would have an open house after the equipment was installed. White testified that he relied on these statements in deciding to purchase the equipment.

White indicated that, in fact, he contacted both KIS and plaintiff about removing the equipment and they never did until it was repossessed, that he lost money while developing as many as nineteen rolls of film per day, that the equipment required the purchase of expensive supplies and chemicals, and that Grahn never returned to hold an open house. Grahn testified that the statement about meeting expenses on five rolls of film per day was partially true and was even possible, but that the statement was based on certain fallacies. Grahn used information provided to him by KIS in making his presentation. Grahn stated that by the time he left his employment with KIS, he was using eight or nine rolls of film per day in his presentations. Grahn indicated that he was unable to return to conduct the open house because his sales territory changed shortly after defendant bought the equipment. He did not recall stating that KIS would remove the equipment following a trial period.

■ The Court is not required to determine whether Grahn actually misrepresented information to White. The Court must determine only whether Grahn's statements, whether true or not, can be attributed to plaintiff. The Court finds that they cannot be. The Court has held, *supra*, that plaintiff and KIS are separate organizations. The testimony in this case, both from Grahn and Alpert, is that Grahn was an employee of KIS, and not of plaintiff. Therefore, Grahn had neither expressed nor implied authority to represent plaintiff. For plaintiff to be held responsible for statements made by Grahn, it must be shown that Grahn had apparent authority to act on plaintiff's behalf.

■ Essential to the creation of apparent authority under New York law, are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own act imbue himself with apparent authority. Rather, the existence of apparent authority depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal— not the agent. *Hallock v. State*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984).

In this case, neither White nor McGehee had any contact with plaintiff by which plaintiff's misleading conduct would clothe Grahn with apparent authority to act on its behalf. The information Grahn used in making his presentation was given to him by KIS, not plaintiff, and if it in any way induced White into buying the equipment, his cause of action must be against KIS. Additionally, the Court notes that even if White had been justified in believing the Grahn was an employee of plaintiff, he was bound to inquire as to what Grahn's authority was. *Karavos Compania, etc. v. Atlantica Export Corp.*, 588 F.2d 1 (2d Cir.1978). There is no evidence that White made such an inquiry. The Court must conclude, therefore, that Grahn was not the agent of plaintiff, and statements made by him cannot in any way be attributed to plaintiff, nor can plaintiff be held liable for them.

## III. THE "COMMERCIAL REASONABLENESS" OF THE SALE

The primary issue raised in this action is whether the sale of the equipment by plaintiff to KIS for $14,412.80 was commercially reasonable under UCC § 9–504(3).[3] Defendants adamantly contend that the sale was not commercially reasonable for the following reasons: (1) defendant's purchase price of the equipment was $36,032.00; (2) White repeatedly requested that plaintiff repossess the equipment for over a year before it was actually repossessed; (3) the equipment was in excellent condition when it was repossessed on March 5, 1986;

(4) defendant did not receive notice of a private sale until October 3, 1986; (5) there was no evidence as to where the equipment was stored or the condition it was in at the time it was resold; and (6) plaintiff offered to sell the equipment to KIS for $14,412.80, and there is no evidence that plaintiff made any effort to contact any buyer other than KIS.

Plaintiff responds that the sale was commercially reasonable because (1) it gave notice of the sale in compliance with § 9–504(3); (2) that it solicited bids from several potential purchasers; and (3) that the price obtained for the equipment in this case was substantially higher than the prices received in prior sales of similar equipment. Plaintiff contends that the equipment had been superceded by newer models, that it could not make warranties or provide service for the equipment, and that the market is limited to persons in the photo-processing business. In addition, plaintiff introduced into evidence an appraisal of equipment done by American Appraisal Associates of Milwaukee, Wisconsin. Equipment like that involved in this case was appraised as having a fair market value of $6,000.00 as of November 30, 1987.

The Court finds this issue to be a very close one. There are factors which tend to favor both parties. The Court, however, has concluded that the sale was commercially reasonable under the UCC. A private sale clearly is a proper method of disposing of collateral. Plaintiff sent notice as required under the Code. Although White testified that he did not receive a copy of the notice, his attorney did, and he

---

**3.** Section 9–504(3) of the UCC provides:

Disposition of collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the

secured party to the debtor, if he has not signed after default a statement recnouncing or modifying his right to notification of sale. In the case of consumer goods, no other notification need by sent. In other cases, notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations, he may buy at private sale.

**898**

called White upon receiving it. UCC § 1–201(26) states that a person receives notice when it comes to his attention. Here, the notice was brought to White's attention by his attorney, and that is all that is necessary.

Plaintiff has set forth sufficient reasons to justify the price that was obtained for the equipment. These reasons have been noted above and need not be repeated here. It is significant that the amount obtained here was higher than that obtained in previous sales of similar equipment, and that the amount received was more than double the appraised value of the equipment. This type of equipment is not customarily sold in a recognized market, and it is not the subject of widely distributed price quotations. The Court notes UCC § 9–507(2), which provides, in part:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.

Here, it would be difficult to have obtained a better price regardless of the time or method chosen for the sale. The Court, therefore, can only conclude that the sale was conducted in a commercially reasonable manner.

Accordingly, it will be the Order and Judgment of this Court that defendants McGehee Publishing Company, Inc., and James P. White, Sr., are liable to plaintiff in the amount of $27,880.60, which represents the amount owing under the Security Agreement and Conditional Sales Contract, less the amount obtained from the sale of the collateral. Concerning the defendant First National Bank of McGehee, the issue has not been pursued by the parties, and the Court refrains from reaching any judgment thereon.

A separate judgment will be entered in accordance with this memorandum opinion.