THOMPSON FARMS, INC. *v.* CORNO FEED PRODUCTS, DIVISION OF NATIONAL OATS CO., INC.

[No. 1-1075A191. Filed August 3, 1977. Rehearing denied September 13, 1977. Transfer denied December 15, 1977.]

*Harlan Heller, Harlan Heller, Ltd.*, of Mattoon, Illinois, *Ray Fehrenbacher, Fehrenbacher & Fleming*, of Olney, Illinois, *Robert V. Kixmiller, Shake, Lewis, Kixmiller & Sturm*, of Vincennes, for appellant.

*Robert P. Doolittle, Jr., Emison, Emison & Doolittle,* of Vincennes, for appellee.

## CASE SUMMARY

ROBERTSON, C.J.—Corno Feed Products, a division of National Oats, Inc. (Corno), filed a complaint on installment sale and security agreements in an action naming Thompson Farms, Inc. (Thompson Farms) defendant. Thompson Farms counterclaimed under the contract theories of breach of express warranties, and breach of implied warranties of merchantability and fitness for a particular purpose, and the tort theories of negligent design and strict liability in tort. Thompson Farms contends on appeal that the negative decision of the trial court on its counterclaims and affirmative defenses was contrary to law.

We reverse and remand.

The facts which are uncontradicted, except where indicated, are as follows. Corno was originally incorporated in 1964, and at the time of the trial was doing business in Missouri, Illinois, Kentucky, Indiana and Arkansas selling livestock and poultry feed. In 1968 and 1969, Corno formulated the Corno Full Circle Hog Marketing Plan, (the Plan) and for about one year tested the feeder pig operation under the Plan. On June 16, 1969, Bill Lannan was hired by Corno as territory manager or field representative for Indiana, northwest Kentucky and southern Illinois. During his one week orientation at Corno's home office in St. Louis, Lannan was told by Bud McCormick, the Corno sales manager, that the Plan described in the sales brochure and blueprints would be his most influential sales tool for the promotion of sales of Corno feeds and the solicitation of dealerships.

The Plan was conceived as a promotional device, which would offer the prospective dealer or producer a program that no other feed company had.

The Plan as described in the Corno brochure consists of 1) a blueprint for a slatted floor hog house ("Corno's Low-Cost Pork Finishing Unit") built over a lagoon, and financing for its purchase and erection, 2) Corno's Complete Feed Program for the hogs and feed financing, and 3) a Pork Production Contract for feeder pig financing in cooperation with a packing company, including assistance for marketing the fattened hogs. The producer who elects financing for his purchase of the hog house is bound under the loan agreement to purchase his requirements of feed from Corno for the duration of the loan agreement. A customer could use any combination of the Plan's components. For example, Corno would finance hogs and feed if the farmer used a different hog house.

In early August, 1969, Lannan contacted Wayne Thompson, manager of Triple T Grain and Fertilizer, Inc. (Triple T), in Vincennes, Indiana, about a Cornor dealership. Shortly thereafter, Lannan, Thompson, Bud McCormick and Basil Bonner, an employee of Triple T, met in Vincennes for two days of discussions concerning the dealership, the cost of the hog houses, the design, the amount Corno would finance, the profitability of the endeavor for the dealer and hog producer, and other topics about the Plan which Corno was asking Triple T to promote. Wayne Thompson was familiar with other designs and had to be convinced about the merits of Corno's design. Also during those meetings, McCormick telephoned and obtained prices from material suppliers. A dealership agreement was consummated. At Wayne Thompson's suggestion Triple T was to undertake to furnish the hog houses according to the Plan and blueprint provided by Corno. McCormick arranged for and paid for advertising which described a "Corno Low-Cost Pork Financing Unit", in Triple T's territory.

Bill Lannan presented the brochure, Plan, and hoghouse blueprint to Wayne Thompson, his brother Ron Thompson, and their father, Charles Thompson. As directors of Thompson Farms, Inc., they agreed to build and have financed two hog houses. At that time Thompson Farms was not in the hog

production business. Because costs of the building became higher than originally estimated, Wayne Thompson requested higher financing per head; the approval came from McCormick's superior, Mr. Matthews, president of Corno Feed Products. Triple T hired the carpenter crew and, with McCormick's help in locating suppliers, purchased the materials. Lannan inspected the structure and sent weekly reports to the Corno home office. Whenever engineering problems arose, Wayne Thompson, or Billy Wells, the Triple T employee overseeing erection of the units, called McCormick for instructions to proceed. Wayne Thompson made trips to Loogootee and Knox County, Indiana, and to Missouri to observe operating Corno hog houses.

The units were finished the last week in October 1969, and on October 31, about 1,000 pigs weighing from 35 to 45 pounds, were purchased and placed inside the units.

On November 1, 1969, Corno entered a loan commitment agreement, for a fee of $247.45, on each house.

Upon McCormick's request, Billy Wells submitted two letters containing a list of his final material requirements and the blueprint containing some approved changes. Corno's sales manager, Bud McCormick, initialed the plans so that the Corno credit department could proceed with the financing. Corno would only finance its hog house, so the plans and specifications of Thompson's hog houses had to be approved by the sales department as a Corno Low-Cost Pork Financing Unit after it was completed. Before financing approval, Corno also required a financing statement and that the customer pay a down payment. Thompson Farms' down payment on each house, $2,981.42, was paid on December 1, 1969. The down payment was recorded as paid on Triple T's invoices, and the record was sent to Corno.

On December 2, 1969, Corno and Thompson Farms entered into what was labelled an "Installment Sale and Security Agreement" for a loan of $10,997.76 for the purchase price

of the first hog house. The loan provided a security interest to Corno in that hog house. Corno's check was made the same day to the order of "Thompson Farms, Inc. and Triple T Grain and Fertilizer, Inc." On December 11, 1969, a similar "Installment Sale and Security Agreement" was entered into between the same parties for the same amount, on the second hog house, and the next day a check was made to the order of the same two parties. Neither Triple. T nor Corno made a profit on the sale of the houses, the loan merely covered the actual cost after the units were finished.

At delivery the health of the pigs was described as very good, but within a week after the pigs were put in the houses, signs of stress appeared. Within two weeks after their arrival, Wayne Thompson contacted Lannan and McCormick, to complain that the hogs showed signs of bloody dysentery, thumping, pneumonia, coughing, tail and ear biting, and that their weights had become uneven. A veterinarian was called, medication was ordered, and more medicated feeds were purchased from Corno, but the hogs did not improve. In early February, 1970, the veterinarian performed autopsies on several pigs weighing approximately 150 pounds, and found that they died of swine dysentery and pneumonia.

On February 3, 1970, Wayne Thompson went with Lannan to St. Louis to meet with McCormick and Matthews. Thompson reiterated the problems with the units: a continuous and strong draft flowed up through the slatted floors, water vapor condensed on the uninsulated metal roof and dripped on the hogs causing them to be continuously cold and wet, the lagoon froze, the water pipes froze and broke, a strong ammonia smell filled the units, plywood put down to cover part of the floor to block some drafts was eaten by the pigs and manure piled up on the plywood, from two or three up to ten pigs died a day, and labor on the units consumed twelve to twenty man-hours a day instead of the hour recommended by Corno. Thompson had studied possible solutions, and at the meeting, he presented corrective suggestions and requested further financing.

Corno reluctantly approved financing for poultry curtains to close the open side of the houses, insulation for the waterlines and the roof, windbreakers between the pens to stop drafts, louvers on the back windows, and for boxing in the sides down to the water level of the lagoon. Loans were approved for $1,500 for each house, and made payable to Triple T and Thompson Farms as were the earlier loans.

The hogs that lived from the initial batch were sold during March and April 1970. That summer another batch approximately 1,000 hogs was introduced. The death loss from pneumonia and dysentery in these two batches of approximately 2,000 hogs was twenty-five percent.

Corno's low-cost Pork Units had been promoted for year-round use. Feeder pigs introduced at thirty-five to forty-five pounds could be finished to market weight of 200 to 220 pounds, each on 520 to 540 pounds of Corno pellet feed, which was represented to be a good feed conversion rate. At the then market value, a profit of $18 per head was predicted from which the producer would pay back to Corno on its loan, $2.00 per head or $5.00 per head per year. The discussion of costs and profit was always part of the sales pitch. Paul Herrington, another Corno sales representative, testified concerning the Corno Low-Cost Pork Finishing Units:

"A. Yes, I would say most of the—that it would be a show of profit, because if you couldn't show a profit, you sure couldn't sell a house."

Keeping a large number of hogs in a small place would save labor and time. Only about an hour a day was said to be necessary to check and feed the pigs.

Thompson Farms made only three payments on the four "Installment Sales and Security Agreements" as follows: on March 31, 1970, a payment of $1,000, on June 22, 1970 a payment of $1,000, on January 18, 1971, the last payment of $5,145.65.

The following issues are presented in this appeal:

    I. Were Thompson Farms' allegations of error in its motion to correct errors sufficiently specific to present an issue on appeal?

    II. Did Thompson Farms adequately present its issues in its motion to correct errors in appealing a negative decision?

    III. Is Corno responsible as Triple T's principal for the sale of the two Corno Low-Cost Pork Finishing Units to Thompson Farms?

    IV. Is Corno a seller within the meaning of the U.C.C. Article II?

    V. Was the transaction a "sale of goods" within the meaning of the U.C.C. Article II?

    VI. Was notice of the alleged breach of warranties given as required by the U.C.C. Article II?

    VII. Did Corno make express warranties?

    VIII. Did the transaction involve implied warranties of merchantability or of fitness for a particular purpose?

## I.

We will first address Corno's procedural arguments. Initially, Corno contends that the specifications of appellant's motion to correct errors present no issue on appeal because Thompson Farms used the word "judgment" in its grounds for error, instead of the term "decision" as used in Ind. Rules of Procedure, Trial Rule 59(A)(4) and (8).

Corno relies, in a lengthy discussion, on case law[1] decided before promulgation of TR. 59 in an attempt to find a similar purpose within TR. 59 to dismiss cases upon technical distinctions.

We agree that there is a distinction between a "decision" and a "judgment", and that, for example, herein the *decision*

---

1. *Rosenzweig* v. *Frazer* (1882), 82 Ind. 342; *Rodefer* v. *Fletcher* (1883), 89 Ind. 563; *Shuman* v. *Hauk* (1968), 142 Ind. App. 220, 233 N.E.2d 678; *Ramey* v. *Urban* (1967), 141 Ind. App. 500, 229 N.E.2d 836; *Watson* v. *Watson* (1957), 127 Ind. App. 591, 144 N.E.2d 529; *Adkins* v. *State* (1955), 234 Ind. 81, 123 N.E.2d 891; *Lynch* v. *Milwaukee Harvester Co.* (1903), 159 Ind. 675, 65 N.E. 1025; *Gates* v. *Baltimore & O.S.W. Ry. Co.* (1900), 154 Ind. 338, 56 N.E. 722.

of the trial court under specification one was that there was no sale, and that the *judgment* was that the plaintiff Corno should recover on the contracts and that there was no merit to the affirmative defenses and counterclaims of the defendant.

Until promulgation of Trial Rule 59, Burns Indiana Statutes Annotated § 2-2401 established causes for a new trial. Because this statute was interpreted to be jurisdictional, the appellate courts required the motion for new trial to be worded in the precise language of the statute.

A case as recent as 1968 held that a specification of error in the motion for new trial declaring "the judgment in this matter is contrary to law" presented no question on appeal since the statute did not recognize such a cause for a new trial.[2] *Shuman* v. *Hauk* (1968), 142 Ind. App. 220, 233 N.E.2d 678.

There is no such requirement in Trial Rule 59 for the motion to correct errors to recite the precise language of the rule. Section (B) specifically states:

2. Burns Indiana Statutes Annotated § 2-2401 (1968 Repl.) (Repealed Acts 1969, ch. 191, § 3) provided:

2-2401 [610]. Causes for.—A new trial may be granted in the following cases:

First. Irregularity in the proceedings of the court, jury or prevailing party, or any order of court, or abuse of discretion, by which the party was prevented from having a fair trial.

Second. Misconduct of the jury or prevailing party.

Third. Accident or surprise, which ordinary prudence could not have guarded against.

Fourth. Excessive damages.

Fifth. Error in the assessment of the amount of recovery, whether too large or too small, where the action is upon a contract, or for the injury or detention of property.

Sixth. That the *verdict or decision* is not sustained by sufficient evidence, or is contrary to law.

Seventh. Newly-discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial.

Eighth. Error of law occurring at the trial and excepted to by the party making the application; and the court, in granting new trials, may allow the same at the costs of the party applying therefor, or on the costs abiding the event of the suit, or a portion of the costs, as the justice and equity of the case may require, taking into consideration the causes which may make such new trial necessary. [Acts 1881 (Spec. Sess.), ch. 38, § 420, p. 240.]

"(B) Form of motion. A motion to correct error shall state the issues upon which error is claimed, but *the issues are not required to be stated under or in the language of the reasons allowed by these rules, by statute or by other law*. The statement of claimed errors shall be specific rather than general, and shall be accompanied by a statement of the facts and grounds upon which the errors are based." (Emphasis supplied.)

Trial Rule 59 requires a statement sufficiently specific to put the trial court on notice of the particular error alleged. *Finch* v. *State* (1975), 264 Ind. 48, 338 N.E.2d 629. Corno does not claim that use of the word "judgment" instead of the proper word "decision" actually impaired in any manner the task of the trial court to render its decision on the matters raised in this motion to correct errors. Corno admits that the facts and grounds listed would not be grounds for error in the *judgment*.

We agree with Professors Harvey & Townsend that:

"[i]f the trial judge believes the Motion to Correct Errors to be insufficient by reason of a technical interpretation of the Rule, or insufficiency of the specification of error charged, he should order the moving party to make a more specific statement or to produce additional information." 4 W. F. Harvey & R. B. Townsend, Indiana Practice, p. 127 (1971).

We find the specifications of error and the grounds thereunder to adequately present Thompson Farms' claims of error. Though we no longer will summarily affirm the trial court's decision because of this technical misstatement, we caution attorneys to be aware of the distinction between a decision or verdict and a judgment.

## II.

Corno next challenges the form of Thompson Farms' specifications of error in its motion to correct errors as it appeals from a negative decision. When appealing a negative decision, the only question that may be presented is whether the decision of the trial court was contrary to law. *A.S.C. Corporation* v. *First National Bank of Elwood* (1960), 241 Ind. 19, 167 N.E.2d 460.

In specifications one through four, Thompson Farms erroneously challenges the sufficiency of the evidence to support the court's negative decision. A challenge to the sufficiency of the evidence or a contention that the decision was contrary to the evidence presents no question for our consideration on appeal. *Borden Cabinet Corp.* v. *Town of Borden* (1974), 160 Ind. App. 399, 312 N.E.2d 138; *Ver Hulst* v. *Hoffman* (1972), 153 Ind. App. 64, 286 N.E.2d 214.

However, in specification five, appellant lists and incorporates the errors and the grounds specified in one through four and asserts that such conclusions of the court are "errors of law."[3] We do not recommend this manner of incorporation, but in this case, through specification five, these issues are adequately presented for our review.

In specification number six, Thompson Farms alleges error in the court's decision against its counterclaim which raised an issue of negligent design. Thompson Farms bore the burden of proof on that issue; by merely questioning the sufficiency of the evidence it has waived consideration of that issue. *A.S.C. Corporation, supra.*

In specification seven appellant alleges the trial court ignored the evidence establishing an agency relationship between Corno and Triple T. "If the evidence entitled appellant to the relief denied it, the decision of the trial court was contrary to law." *A.S.C. Corporation, supra* at 462. An issue of agency was sufficiently raised for our consideration.

Appellant's final specification of error merely is a recital of facts; no error is alleged for our review therein.

---

3. Corno cites *Mitchell* v. *Lawson* (1969), 145 Ind. App. 141, 250 N.E.2d 259, for the proposition that when two or more assignments of error are assigned jointly, or in gross, "all such reasons must be good, or such assignment of cause will not be available on appeal." *Id.,* at p. 261. By incorporating specifications one through four within five, both the sufficiency error and the contrary to law error might be understood to be assigned jointly. The assignments of error are sufficiently clear to be understood by the trial court. Thus, we again reject Corno's reliance on pre-Trial Rule 59 law merely to affirm the trial court because of a technical irregularity.

### III.

Because Thompson Farms appeals from a negative decision on its affirmative defenses, we may reverse only where the evidence before the court is substantially without conflict, or the court has made findings of conflicting evidence in support of its decision, and such evidence or findings support only one reasonable inference or conclusion which is contrary to the court's decision. Such a decision is then contrary to law. *DeMichaeli & Associates* v. *Sanders* (1976), 167 Ind. App. 669, 340 N.E.2d 796, 803.

Thompson Farms contends that the trial court's failure to find that Triple T was an agent of Corno and its conclusion that Corno is not a seller within the meaning of that term under the Uniform Commercial Code (U.C.C.), are contrary to law. In its special findings, the trial court found that Triple T sold and Thompson Farms purchased two hog houses.

*"Findings of Fact.*

8. Triple T Grain and Fertilizer, Inc. constructed and sold the two slatted floored hog houses to the Defendant Thompson, Farms, Inc. . . .

13. Defendant purchased the two hog houses from Triple T Grain and Fertilizer, Inc., which billed the two hog houses to Defendant as Triple T Turnkey Swine Finishing Units."

But in its conclusions of law the trial court stated:

*"Conclusions of Law.*

1. The transaction between Plaintiff Corno and Defendant Thompson Farms, Inc., with respect to the Corno Low Cost Pork Finishing Units was not a sale of goods subject to the provisions of Article II of the Uniform Commercial Code."

The trial court made no finding or conclusions of law on agency.

A review of the uncontradicted evidence convinces us that it was unreasonable for the trial court to find that Triple T was not an agent of Corno.[4]

---

4. This decision addresses the purchase of two hog houses by Thompson Farms from Triple T, and does not decide all responsibilities arising from sales by Triple T to other customers.

We cannot find that Triple T was a local representative or a general agent for transacting all of Corno's business in its dealership territory since the full dealership agreement is not before us in the record. From the record, however, we do find an implied agency relationship which established Triple T as Corno's special agent pursuant to its activities relating to the Corno Full Circle Hog Marketing Plan.

Agency is defined as a relationship which results from a) the manifestation of consent by one person to another, to undertake some business b) on his behalf or in his name, and subject to his control, and c) the authority and consent of the other for such person to so act. *Lincoln National Bank & Trust Company of Ft. Wayne* v. *Parker* (1941), 110 Ind. App. 1, 34 N.E.2d 190. The agent acts for his principal in the same manner as though the principal himself had acted. *Silverstein* v. *Central Furniture Co.* (1960), 131 Ind. App. 170, 162 N.E.2d 690. "A special agent is one who is authorized to do one or more specific acts, in pursuance of particular instructions or within restrictions necessarily implied from the act to be done. The principal is not bound by the acts of a special agent, if he exceeds the limits of his authority." *Voorhees-Jontz Lumber Co.* v. *Bezek* (1965), 137 Ind. App. 382, 209 N.E.2d 380. Agency is usually a question of fact. *Travelers Indemnity Company of Hartford* v. *State ex rel. Favre* (1972), 154 Ind. App. 553, 290 N.E.2d 456, and in that context, the finding of fact on that issue, however defective, would not be contrary to law unless the evidence entitled the appellant to relief which was denied. *Metrailer* v. *Bishop* (1959), 130 Ind. App. 77, 162 N.E.2d 94. In this case, the facts establishing agency are without conflict, and conflicting inferences cannot be drawn from such facts. Thus, the question whether Triple T is or is not an agent of Corno is a question of law for the court. 3 Am. Jur.2d Agency § 359 (1962). *See: Michigan Mutual Life Insurance Co.* v. *Thompson* (1908), 44 Ind. App. 180, 86 N.E. 503. The appellant, Thompson Farms, must show that the decision of the trial court denied the

relief to which it was entitled under the evidence and hence was contrary to law. *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N.E.2d 669.

Uncontradicted evidence will sometimes support conflicting reasonable inferences, and when this is the case, the inference drawn by the trier of fact will prevail. *A.S.C. Corporation* v. *First National Bank of Elwood, supra.* However, the trial court's conclusion may be found to be unreasonable when the evidence is all one way and but one conclusion can be reached from the facts proved, such conclusion being contrary to the conclusion reached by the trial court.

The uncontradicted evidence shows that Triple T consented to represent Corno and to promote Corno's exclusive Full Circle Plan. In the first meetings between Corno's representative and Triple T's representatives, the parties discussed in detail the choice of design and material requirements of the hog house in the Plan. Wayne Thompson finally agreed to promote the blueprint design and the Corno Full Circle Hog Marketing Plan on Corno's behalf, subject to the specifications imposed by Corno within the Plan. There is no evidence that Triple T refused to undertake to promote Corno's Full Circle Plan or that Triple T presented the Plan as its own program. Triple T did not consider erecting just any hog confinement structure that a customer's needs required in an attempt to increase its own sales from its inventory of Corno feeds. The only structure it would sell was a Corno unit, and when engineering problems arose, Triple T's employee, Billy Wells, or Wayne Thompson himself, contacted the Corno sales department for direction.

The promotion was pursued in Corno's name. The blueprint shows the Corno logo and is clearly labeled "Corno Low-Cost Pork Finishing Unit." Triple T was authorized to use the Corno Full Circle Hog Marketing Plan booklet as a tool to promote the program. The words "Corno Feed Products" followed by its

St. Louis address, appear on every page of this booklet. Large "Corno" signs were attached to the dealer's store and trucks. The Triple T sales representative, Basil Bonner, as well as two Corno sales representatives, Paul Herrington and Bill Lannan, testified that they promoted the Finishing Unit as a Corno product and as part of that company's promotional plan. In its findings, the trial court repeatedly refers to Thompson Farms' units as "Corno Low-Cost Pork Finishing Units."

Mr. McCormick, Corno's sales manager, approved Wayne Thompson's proposal to have Triple T build the hog houses and charge one price, equal to the cost of materials and labor without profit, for the products. Production of the hog houses was an integral component of Corno's Full Circle Plan, and Triple T's proposed method of executing this part of the Plan was authorized and consented to by Corno. Corno asked Triple T to promote its particular product and design, paid for advertising in Triple T's district, and approved financing for hog houses sold by Triple T. Therefore, it would be unreasonable to find that Triple T's sales of hog houses were not authorized by Corno.

Triple T representatives were not authorized to sign any contracts guaranteeing or approving financing under the Plan; their specialized function was simply to bring about, between Corno and a customer, a contractual relationship which would provide financing to increase the customer's investment in hog production in exchange for a promise to buy Corno's feeds. By signing the contract for financing, a customer agreed to use Corno Feeds exclusively throughout the life of the obligation. This term of every financing contract was a promise made to Corno, not to Triple T. Therefore, Triple T's customers were contractually bound to Corno, while Triple T was merely the conduit for distribution of Corno Feeds purchased under the Plan for the territory.

Corno rests its argument that Triple T was selling its own product on the use of the words "Triple T Turnkey Swine Finishing Unit" on Triple T's billing invoice. This contention

could only be reasonable if all other evidence was totally disbelieved and disregarded. The Thompson Farms representatives were presented with the Corno Plan brochure and Corno Finishing Unit blueprint by a Corno sales representative, at which time they agreed to purchase that product. There is no evidence to indicate that Thompson Farms understood that Triple T, instead of Corno, was selling the Unit as its own product.

The final specifications list on the hog houses sold to Thompson Farms, which was sent to McCormick, also used the term "Triple T Turnkey Swine Finishing Units." Use of this label in these instances may have identified the product to the local dealer, but it does not remove from the product its identity as a component of Corno's promotional product.

We conclude that the only reasonable interpretation of the evidence supports the finding of implied agency. Triple T consented to undertake the promotion of Corno's feed products, subject to the terms of the Plan as designated by Corno, and Corno consented to and authorized Triple T's acts in pursuance of the Plan.

We further conclude that Corno is bound to third parties by all acts within the actual or apparent scope of Triple T's authority. Triple T, as the agent, was acting for Corno when it sold Finishing Units under the Plan. Thus Corno, as principal, is responsible as the seller of the products purchased under this Plan. As principal, Corno, not its agent, must bear liability for all actions that occurred within the agency relationship relating to the promotion of the Full Circle Plan.

> ". . . [T]he rule in Indiana is that where a person is known to be contracting as an agent of another, who is known to be the principal, the contract, if within the authority which is granted to the agent, does not bind the agent personally but only binds the principal."

*Tudor* v. *Heugel* (1961), 132 Ind. App. 579, 583, 178 N.E.2d 442, 444, rev'd on other grounds, 264 Ind. 1, 280 N.E.2d 300

(1972) ; *See also: Kiyose* v. *Trustees of Indiana University* (1975), 166 Ind. App. 34, 333 N.E.2d 886.

By the prominence of the Corno name throughout the sales brochure and on the blueprints, by the pre-engineered design restrictions, by the reimbursed advertising and personal promotion by Corno representatives and by Corno's offer to supply the means to participate in the plan (financing), Thompson Farms could have assumed that Corno was the principal in the transactions under the Plan. It was Corno's own sales representative, Bill Lannan, who, by means of a lengthy sales presentation to the Thompson Farms' representatives, convinced them to have two hog houses built at Thompson Farms.

In the *Foss-Schneider Brewing Co.* v. *McLaughlin* (1892), 5 Ind. App. 415, 418-419, 31 N.E. 838, 839-840, this court stated that

". . . An agency will, at times, be implied from circumstances, in order to protect the rights of innocent parties, even where no contract of agency in fact exists. The law upon this question is well stated in Mechem Agency, section 84. It is there said: 'It may therefore be stated as a general rule that whenever a person has held out another as his agent authorized him to act for him in a given capacity; or has knowingly and without dissent permitted such other to act as his agent in such capacity; or where his habits and course of dealing have been such as to reasonably warrant the presumption that such other was his agent, authorized to act in that capacity; whether it be in a single transaction or in a series of transactions, his authority to such other to act for him in that capacity will be conclusively presumed, so far as it may be necessary to protect the rights of third persons who have relied thereon in good faith and in the exercise of reasonable prudence, and he will not be permitted to deny that such other was his agent, authorized to do the act that he assumed to do, provided that such act is within the real or apparent scope of the presumed authority.'

\* \* \*

". . . The rule, that when under circumstances and conditions one of two persons must suffer, the one who made the circumstances and conditions possible must be held responsible, is a just and salutary one."

We find that all the evidence points to the conclusion that Corno contracted with Triple T to be its special agent, and authorized in its use of the Corno Full Circle Plan, to perform all acts necessary for promotion, including the production of the Finishing Units which were a key product under the Corno Plan.

## V.

Corno contends that it was only involved in financing the transaction and cannot be considered a seller of the hog houses to Thompson Farms.

We agree with Corno and the trial court that the transactions evidenced by exhibits #A through #D, each titled "In-installment Sales and Security Agreement", were loan commitments entered into between Corno and Thompson Farms. In each loan commitment agreement Corno claimed a security interest in the hog house which was purchased or improved by use of the proceeds. *See:* IC 1971, 26-1-9-105(1) ((h) (Burns Code Ed.) and 26-1-1-201(37) (Burns Code Ed.).[5]

The Uniform Commercial Code defines a "secured party" as a lender, seller, or other person in whose favor there is security interest. Corno clearly qualifies as a lender in whose favor there is a security interest. IC 1971, 26-1-9-105(1) (i) (Burns Code Ed.).

The intention of the parties as to the nature of the financing transaction is further evidenced by the following resolution adopted by the board of directors of Thompson Farms on November 13, 1969:

"BE IT RESOLVED, that the corporation borrow from Corno Feed Products, a division of National Oats Co., Inc. of East St. Louis, Illinois, from time to time, such sums as may be necessary in the opinion of the officers, or officer, of said corporation, and to execute any and all instruments required to secure said loan, or loans, to said Company."

However, our agreement with the trial court that loan commitments were entered into between Corno and Thompson

5. No question of the validity of the security interest is raised under U.C.C., Article 9.

Farms is not dispositive of the issue of Corno's responsibility as a seller. Notwithstanding results in two other jurisdictions that the particular parties were not both a financing agency and a seller, *In re Sherwood Diversified Services, Inc.* (S.D.N.Y. 1974), 382 F.Supp. 1359, 15 U.C.C. Rep. 701; *Atlas Industries, Inc.* v. *National Cash Register Co.* (1975), 216 Kan. 213, 531 P.2d 41, 16 U.C.C. Rep. 302, we conclude that in this case a finding that Corno acted as a financing agency does not preclude a finding that Corno is also a seller.[6]

Corno's Sales Department was responsible for the sale of the hog houses. A Corno sales representative solicited Triple T to become a dealer to sell the hog houses, he directly solicited Thompson Farms as a customer for the hog houses, and he regularly inspected the erection of the units for conformity to the Corno blueprints; it was necessary to notify the Sales Department whenever a design or functional problem arose, and that department provided official approval of the unit as a Corno product before financing could be provided.

The code defines a seller as "a person who sells or contracts to sell goods." IC 1971, 26-1-2-103 (Burns Code Ed.). Corno, through its agents (sales personnel and dealer working within the Plan), was a seller who contracted to sell the two hog houses to Thompson Farms.

6. The Code defines financing agency at IC 1971, 26-1-2-104 (Burns Code Ed.),

"(2) 'Financing agency' means a bank, finance company or other person who in the ordinary course of business makes advances against goods or documents of title or who by arrangement with either the seller or the buyer intervenes in the ordinary course to make or collect payment due or claimed under the contract for sale, as by purchasing or paying the seller's draft or making advances against it or by merely taking it for collection whether or not documents of title accompany the draft. 'Financing agency' includes also a bank or other person who similarly intervenes between persons who are in the position of seller and buyer in respect to the goods (section [26-1-]2-707)."

Corno apparently performed financing services "in the ordinary course of business . . . against goods," and did so in this case "under the contract for sale" of the hog houses and improvements.

Corno also was a financing agency in this transaction.[7] After approval, the Financing Department completed consideration of the loan application. The total transaction was not a traditional conditional sales transaction in that, instead of extending credit, Corno advanced the money to Thompson Farms in the form of a loan,[8] so that Triple T would be able to pay quickly for the labor and materials it purchased.

We disagree with Corno's reliance on IC 1971, 26-1-2-102 (Burns Code Ed.) to remove this transaction from consideration under Article II of the U.C.C.:

> "Unless the context otherwise requires, this article [chapter] applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction. . . ." *See also: Atlas Industries, supra.*

The finance agreement was a security transaction, but the whole transaction also involved the sale of goods under the U.C.C. The use of the words "Corno . . . called 'Secured Party' agrees to sell" and "Thompson Farms . . . called 'Borrower' who agrees to buy" reflects the complexity of the transaction and may indicate that the parties recognize the dual nature of the transactions.

### V.

The warranty provisions of Article II of the Uniform Commercial Code are clearly limited to the sale of goods.[9] *Bona*

---

7. Some cases have recognized that a finance agency that has a broader interest or participation in a transaction than that of the usual moneylender, may incur a duty to a party and be liable for losses sustained by that party which occur beyond the scope or privity of its financing responsibility. *Connor* v. *Great Western Savings and Loan Association* (1968), 69 Cal.2d 850, 73 Cal. Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224; *Flamingo Drift Fishing, Inc.* v. *Nix* (Fla. App. 1971), 251 So.2d 316; *Callaizakis* v. *Astor Development Co.* (1972), 4 Ill. App. 3d 163, 280 N.E.2d 512.

8. The two checks, for $10,997.76 each, given on the loans for purchase of the hog houses, and for $1500 each for the improvement were all to the order of Thompson Farms, Inc. and Triple T Grain and Fertilizer, Inc.

9. Although some jurisdictions have held the Uniform Commercial Code applicable to arrangements found to be analogous to a sale, this consideration does not arise in the instant case wherein the trial court found the instant transaction to be a sale. *See: Atlas Industries, Inc.*

v. *Graefe* (1972), 264 Md. 69, 285 A.2d 607. The court in *Bona* cited the Official Comment to U.C.C. § 213, which says in part:

"Although *this section* [dealing with express warranties] *is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale*, the warranty sections of this Subtitle are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." (Our emphasis.)

The definitions of "contract for sale" and "sale" are found in IC 1971, 26-1-2-106 (Burns Code Ed.):

"(1) In this article [chapter] unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (section [26-1-]2-401)."

We do not disturb the trial court's finding that a sale of the finishing unit was completed between Thompson Farms and Triple T, whom we find to have been a special agent of Corno. The transaction was no less a sale because it was made without profit to the seller, Corno. *Department of Treasury* v. *Fairmount Glass Works* (1943), 113 Ind. App. 684, 49 N.E.2d 1.

As the statutes quoted above indicate, the warranty provisions of Article II apply only to a transaction which is a sale of *goods*. The parties did not argue at the trial below, or in their briefs, whether the hog houses may properly be classified as "goods" under the U.C.C. Neither do the findings of the trial court (which are principally in the form in which they were submitted by the parties) address this issue.

---

v. *National Cash Register Co.* (1975), 216 Kan. 213, 531 P.2d 41, 16 U.C.C. Rep. 302; *Hertz Commercial Leasing Corp.* v. *Transportation Credit Clearing House* (N.Y. Civ. Ct. 1969), 59 Misc.2d 226, 298 N.Y.S. 2d 392, 64 U.C.C. Rep. 132; Williston, Williston on Sales, § 18-7, p. 74; Farnsworth, *Implied Warranties of Quality in Non-Sales Cases*, 57 Colum. L. Rev. 653 (1957).

From the record, it appears that the parties and the court considered the units to be goods. The fact that the loan agreement stated that Corno agreed to sell and Thompson Farms agreed to buy the "equipment" described therein, indicates an understanding that title in the product was transferred at some time, rather than there having been, for example, a contract for a service or for work and materials only. *See: Curtis Publishing Co.* v. *Sheridan* (S.D.N.Y. 1971), 53 F.R.D. 642, 10 U.C.C. Rep. 661 (consideration of matters essential to the characterization of the contract as a contract for work or for a sale of goods). The findings by the trial court that Thompson Farms did purchase the hog houses further indicate that the parties understood that a transfer of title and property occurred.

Although Corno's plan was pre-designed, it was specially designed for Indiana area hog producers, and it was specially manufactured for Thompson Farms. Corno supplied more than a design or professional recommendation. Thompson Farms purchased a product and was charged for the finished unit. *See: Aluminum Company of America* v. *Electro Flo Corp.* (10th Cir. 1971), 451 F.2d 1115, 10 U.C.C. Rep. 88.

The U.C.C. defines "goods" as follows:

"(1) 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8 [26-1-8-101—26-1-8-406] and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section [26-1-]2-107)." IC 1971, 26-1-2-105 (Burns Code Ed.).

The question arises, were the units things which were movable at the time of identification to the contract for sale?

Within the loan contract Corno refers to the hog houses as "equipment" along with the bulk bins, augers, waterers, feeders, and the other equipment used with the hog houses. Pro-

visions additional to the printed form within the lending agreement provided:·

"1. [Borrower] will not remove the equipment from its physical location where delivered by the Secured Party unless he first obtains consent of Secured Party in writing in advance,

2. [Borrower] will not abuse or misuse the equipment and will not permit it to be wasted or deteriorate, except for ordinary wear and tear, nor sell, transfer, encumber, or dispose of the equipment or permit it to be subjected to any unpaid charge without the consent of Secured Party in advance in wirting.

\* \* \*

5. In the event Borrower shall breach any of his covenants under this agreement . . . the Secured Party may take peaceful possession of the equipment and exercise all its rights under applicable law.

\* \* \*

10. (Provides the Secured Party and its agents the right of ingress and egress to the hog house for the purpose of operating the hog houses upon default in addition to provisions of Paragraph 5)."

Triple T, the agent-seller, was responsible for paying for the labor and materials as an ordinary manufacturer. Thompson Farms paid a single price to Triple T for the completed package, which not only included the materials and labor, but also included the agreement that it would be a Corno unit which was acceptable for financing.

A mobile home, electricity, and a car-washing center have been considered "goods" by Indiana Courts. *Jones* v. *Abriani* (1976), 169 Ind. App. 556, 350 N.E.2d 635; *Helvey* v. *Wabash County REMC* (1972), 151 Ind. App. 176, 278 N.E.2d 608; *Abbett* v. *Thompson* (1970), 148 Ind. App. 25, 263 N.E.2d 733. In finding that a 1-million gallon water tank which was to be assembled on site constituted "goods" within the meaning of the U.C.C., the 7th Circuit Court of Appeals stated:

"We find ample support in cases arising under the UCC itself that the scope of coverage of 'goods' is not to be given a narrow construction but instead should be viewed as being broad in scope so as to carry out the underlying purpose of the Code of achieving uniformity in commercial transac-

tions. The Code, which by its own terms, § 1-102, is to be liberally construed, should be uniformly applied to achieve its purposes. We believe Illinois would so decide. In the present case, while the finished tank was scarcely one to be taken off the shelf, we are unaware of any authority that specially manufactured small dies should be goods and a very large tank not so classified. In the words of the UCC this was a 'movable' 'thing' 'specially manufactured.' That which PDM agreed to sell and Brookhaven agreed to buy was not services but goods as defined in the UCC."

*Pittsburgh-Des Moines Steel Co.* v. *Brookhaven Manor Water Co.* (7th Cir. 1976), 532 F.2d 572, 580, 18 U.C.C. Rep. 931, 939-940. *See also: Winter* v. *Honeggers' & Co., Inc.* (Ia. 1974), 215 N.W.2d 316.

> We are satisfied that the hog houses were "goods" within the meaning of the U.C.C. as they were apparently so considered by the parties and the trial court.

## VI.

Corno asserts, for the first time on appeal, that Thompson Farms failed to give notice of the alleged defects causing the claimed breaches of warranties until it filed its counterclaim in the trial court proceedings.

The parties agreed that Thompson Farms accepted the tender of goods. When tender has been accepted, the U.C.C. provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. . . ." IC 1971, 26-1-2-607 (3) (a) (Burns Code Ed.). Only when the buyer has given notification as required in § 2-607(3)(a) may he recover damages for any loss resulting from his seller's breach. IC 1971, 26-1-2-714 (Burns Code Ed.).

These statutes have been interpreted in other jurisdictions to impose upon the claimant a condition precedent to recovery. *Winter* v. *Honeggers' & Co., Inc., supra; L.A. Green Seed Company of Arkansas* v. *Williams* (1969), 246 Ark. 463, 438 S.W.2d 717; *Page* v. *Camper City & Mobile Home Sales*

(1974), 292 Ala. 562, 297 So.2d 810; *See:* Annot., 53 A.L.R.2d 270 (Supp. 1976). The interpretation that the notice require-ment conditions recovery is supported by the Commission's Comment to U.C.C. § 2-607, which refers to the notice as "noti-fication which saves the buyer's rights." When the notifica-tion is a substantive condition precedent, as this notice re-quirement has been interpreted, rather than a procedure con-dition precedent, the complaining party's complaint must con-tain an allegation of notice to the party against whom the claimed breach of warranty is directed. *Winter, supra; L.A. Green, supra; Page, supra; See: Thompson* v. *City of Aurora* (1975), 263 Ind. 187, 325 N.E.2d 839.

We hold, consistent with the decisions cited, that section 2-607(3)(a) notice is a substantive condition precedent and that in his complaint, the party claiming breach of warranty must allege that notice was given, in accordance with § 2-607 (3)(a). According to Ind. Rules of Procedure, Trial Rule 9(C), in pleading performance of this condition precedent, it was suf-ficient for Thompson Farms to aver generally that notice was given, as it did in its affirmative defense, I(7) which was incorporated by reference into its counterclaim Number III:

"That the Plaintiff was duly notified of the defects in said hog houses and of the breach of express warranty and implied warranties, but Plaintiff has failed to make the said hog houses conform to the said warranties."

Trial Rule 9(C) also provides that "[a] denial of per-formance or occurrence shall be made specifically and with particularity. . . ." The Court in *Winter* v. *Honneg-gers' & Co., Inc., supra,* discussed the federal inter-pretation of Fed. R. Civ. P. 9(c) and similarly held that notice was not put in issue where the defendant merely denied generally that notice was given.

Corno responded to Thompson Farm's affirmative answers and counter claims by general denial. It cannot raise an issue of nonperformance by a general denial. Therefore, no fact issue as to the question of notice was presented to the trial

court in the pleadings. "Questions as to a proposition of fact not presented to the trial court and upon which no evidence was introduced cannot be raised for the first time on appeal." *Kinzel* v. *Rettinger* (1972), 151 Ind. App. 119, 277 N.E.2d 913; *J.I. Case Company* v. *Sandefur* (1963), 245 Ind. 213, 197 N.E.2d 519. The trial court properly made no findings of fact concerning notice.

Because Trial Rule 9(C) specifically requires a denial of a condition precedent to be pleaded specially, we interpret this requirement to supercede an argument that when some evidence as to the issue of notice was introduced, the pleadings should be considered to have been amended under Ind. Rules of Procedure Trial Rule 15(B) to conform to the evidence.

"The policy behind TR. 15(B) is to promote relief for a party based upon the evidence actually forthcoming at trial, notwithstanding the initial direction set by the pleadings." *Ayr-Way Stores, Inc.* v. *Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335. In other words, amendments are allowed where facts are sufficiently pleaded in the original complaint which should have put the other party on notice as to the evidence presented at trial. The complaint may be amended to change the theory of recovery where supported by the facts.

However, TR. 9(C), by requiring a condition precedent to be pleaded establishes also that it does *not* become an issue unless the defendant answers with a specific denial. Evidence introduced during the trial describing the transaction may include facts which show whether notice was given, but *lack* of notice within the warranty theories is not an issue to be determined by the trier of fact unless the answering party pleads in a specific manner that notice was lacking.

## VII.

In its special finding, Number 32, the trial court found:

"32. Plaintiff Corno did not specifically or impliedly make any warranties relative to the "Corno Low Cost Pork Finishing Units" but did recommend the use of same."

The record does not indicate whether this conclusion of ultimate fact was drawn by the court because it found that there was no sale, or whether the trial court actually found that Corno's express statements in the record did not constitute express warranties. The court went on to find, under Findings for Affirmative Defenses Nos. 2 and 3, that the Corno units "were not the best type of Pork Finishing units available or obtainable and Plaintiff Corno did not represent same to be." The simple statement that a product "is the best" would be puffing, but statements of fact describing the product's capabilities may be found to be express warranties. *Klages* v. *General Ordnance Equipment Corp.* (1976), 240 Pa. Sup. 356, 367 A.2d 304, 19 U.C.C. Rep. 22; *Bickett* v. *W.R. Grace & Company* (W.D.Ky. 1972), 12 U.C.C. Rep. 629. Because the basis for the court's conclusion is unclear, and in light of our discussion regarding a sale and transfer of goods from Corno to Thompson Farms, upon remand the trial court may make further findings concerning the existence or nonexistence of express warranties.

## VIII.

On the other hand, one does not *make* an implied warranty.

". . . [I]mplied warranties of merchantability and fitness for a particular puropse do not arise out of an agreement between the parties; they may even exist when no specific promise has been made by the seller to the buyer. Intrastate Credit Service, Inc. v. Pervo Paint Co. (1965), 236 Cal. App.2d 547, 46 Cal. Rptr. 182; Vernali v. Centrella, (1970), 280 Conn. Sup. 476, 266 A.2d 200.

Thus, they are imposed *by operation of law* for the protection of the buyer, and they must be liberally construed in favor of the buyer." (Our emphasis.)

*Woodruff* v. *Clark County Farm Bureau Cooperative Association, Inc.* (1972), 153 Ind. App. 31, 42, 286 N.E.2d 188, 194.

U.C.C. Section 2-314 creates an implied warranty of merchantability in all contracts for the sale of goods with respect

to which the seller is a merchant. *Woodruff, supra.* The U.C.C. defines merchant as:

". . . a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." IC 1971, 26-1-2-104 (Burns Code Ed.).

The only finding of the trial court relevant to this issue reads as follows:

"26.  In brochures prepared by Plaintiff Corno, Corno held itself out as having special skills and expertise with regard to the raising of swine in the following manner:

A.  It prepared the circulated brochures describing the 'Corno Full Circle Hog Marketing Plan', including the recommended use of 'Corno Low Cost Pork Finishing Units.'

B.  It recommended the use of 'Corno Low Cost Pork Finishing Units' and solicited the sale of Corno feed, and other products by and through agents and dealers.

C.  It prepared plans and specifications for construction of the 'Corno Low Cost Pork Finishing Units' for use by its customers.

27.  Plaintiff Corno represented to purchasers, including Thompson Farms, Inc., that it has tested the 'Corno Low Cost Pork Finishing Units' and had, in fact, made certain tests of the 'Corno Low Cost Pork Finishing Units.' "

The Court made no ultimate finding that Corno was a merchant with respect to the hog houses.

However, we need not consider whether Corno is a merchant with respect to the sale of the hog houses in this transaction because we find that an implied warranty of fitness for a particular purpose does exist. Such a warranty occurs where:

". . . the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified, under the next section an

implied warranty that the goods shall be fit for such purpose." IC 1971, 26-1-2-315 (Burns Code Ed.).

Corno knew the patricular purpose for which Thompson Farms intended to use the Corno hog houses. Corno sales department representatives made the contacts to persuade Wayne Thompson to be a dealer and give similar sales presentations to the other Thompsons to persuade them to purchase the hog houses and to begin production of hogs. Corno told them the purpose for which the units were to be used.

Corno knew that small pigs would be introduced into the finishing units when they were completed that autumn. Mr. McCormick had warned Wayne Thompson not to put small pigs in the units "in the dead of winter," but the batch of 1,000 pigs entered the units on October 31, 1969.

The uncontradicted evidence clearly shows that Wayne Thompson was skeptical about the adequacy of the Corno-type hog house. However, he testified that he had confidence in the Corno brand name and he consented to build the hog houses only because he was relying on their skill and judgment on confinement operations. His reliance was reinforced by their eagerness to finance that particular house.

The Code specifically provides the method of exclusion or modification of implied warranties:

"(2)   Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in the case of a writing must be conspicuous, and *to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous*. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

(3)   Notwithstanding subsection (2)

(a)   unless the circumstances indicate otherwise all implied warranties are excluded by expressions like 'as is' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade." IC 1971, 26-1-2-316 (Burns Code Ed.). (Emphasis supplied.)

The Record discloses no evidence of any disclaimer of the implied warranty of fitness for the particular purpose of raising small hogs. Therefore, it remained in full force at the time of the sale. Wayne and Robert Thompson inspected a Corno unit in Loogootee, Indiana. However, that examination was in the fall and would not necessarily have revealed the problems to be caused by winter weather or hot summer weather.

Whether Corno breached its implied warranty of fitness, and the amount of damages are questions of fact for the trial court. We must therefore remand this cause for further findings consistent with this Court's holdings that Corno was the seller of the hog houses to Thompson Farms, through its agent Triple T, and that an implied warranty of fitness for a particular purpose existed in the transaction.

We reverse and remand for further action not inconsistent with this opinion.

Lowdermilk, J., concurs; Garrard, J., (participating by designation) concurs in part, dissents in part with opinion.

## OPINION CONCURRING IN PART AND DISSENTING IN PART

GARRARD, J.—I do not agree that the facts of this case in the dispute between Corno Feed Products (Corno) and Thompson Farms, Inc. (the buyer) can be properly characterized as a "sale of goods" so as to bring the parties' dealings under Article 2 of the Uniform Commercial Code. *See,* IC 1971, 26-1-2-102, 105.

However, I do not believe as the trial court apparently did,[1] that this determination is dispositive of the buyer's contentions as to breach of warranty.

The pretrial order asserted a contract between Corno and the buyer which gave rise to express and implied warranties which the buyer asserted were breached respecting a hog house. The facts, which are set forth in detail by the majority, disclose that Corno desired to promote the sale of hog feed it manufactured. To do so it devised the Corno Full Circle Hog Marketing Plan. The plan was designed to encourage farmers to engage in raising feeder pigs for market. Thus, Corno designed a reasonably priced slatted-floor hog house which it promoted as a means for profitably raising pigs with the expenditure of little time by the farmer. Under the plan Corno agreed to finance the construction of such hog houses as well as the acquisition of the pigs to be fed. It provided arrangements for sale of the pigs when they reached market size. The condition of the plan was an agreement by the farmer to use only Corno feeds during the life of the financing agreements. In this case there is no doubt that Corno directly negotiated and agreed with the buyer for implementation of the plan. It is also beyond question that the allegedly defective design of the hog house is the basis upon which the buyer premises any liability of Corno.

Under these circumstances I believe it is immaterial whether the third party who supplied the materials and/or constructed the house to Corno's approval according to its plans and specifications was a Corno agent or merely an independent contractor. It is similarly immaterial whether Corno sold its feed through its own agent or through a dealer. There was a bargained-for meeting of the minds between Corno and the buyer

---

1. The special findings of the trial court determined that the situation did not constitute a sale of goods by Corno. A fair reading of the other findings and the court's conclusions indicate that because of this determination the court found that Corno had no warranty obligations. Court's conclusions 1 and 2 as to Affirmative Defense No. 1.

on use of the plan. While under such circumstances without the majority's finding of special agency it is difficult to ascertain a benefit to Corno constituting consideration, no such benefit is necessary to the formation of a valid contract. The consideration arises from the detriment incurred by the buyer through its adoption of the plan and use of the hog house. *Pitcher* v. *Dove* (1884), 99 Ind. 175; *Glasgow* v. *Hobbs* (1869), 32 Ind. 440; *Timberlake* v. *J.R. Watkins Co.* (1965), 138 Ind. App. 554, 209 N.E.2d 909, *reh. den.* 138 Ind. App. 554, 211 N.E.2d 193.

Turning then to the question of warranty, Williston urges that the term "implied warranty" be restricted to warranties implied by law. 4 Williston on Contracts (3rd Ed.) § 969. Indiana decisions appear amenable to this limitation. (*See, e.g., Theis* v. *Heuer* (1972), 264 Ind. 1, 280 N.E.2d 300; *Carmichael* v. *Lavengood* (1942), 112 Ind. App. 144, 44 N.E.2d 177; *Hitz* v. *Warner* (1911), 47 Ind. App. 612, 93 N.E. 1005) and it accords with the broad definition of *express* warranty found in the Uniform Commercial Code, IC 1971, 26-1-2-313:

"(1)   Express warranties by the seller are created as follows:

(a)   any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b)   any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)   any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2)   It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

Express warranty has been similarly defined apart from special statute.[2] I would therefore adopt the commercial code definition as the general definition of express warranty for purposes of contract law.

The case should therefore be remanded for a determination of whether Corno made express warranties which were breached, and, if so, the extent of the damages suffered by the buyer.

Since the contract with Corno was not, in my view, within the sales article of the commercial code, the implied warranties of IC 1971, 26-1-2-314 are not directly applicable. The traditional rule would apparently not imply warranties of merchantability or fitness for particular purposes. *Compare, however, Barnes* v. *Mac Brown & Co., Inc.* (1976), 264 Ind. 227, 342 N.E.2d 619; *Theis* v. *Heuer, supra.*

On the other hand, Indiana has long recognized that a promisor may owe a duty to use reasonable care in the performance of matters contemplated by the contract. Where the duty arises and is breached the promisee may maintain an action for negligence. *Flint & Walling Mfg. Co.* v. *Beckett* (1906), 167 Ind. 491, 79 N.E. 503. It appears to me that the liability imposed in such a case (as opposed to the theoretical, or doctrinal basis *for* liability) under such circumstances might closely approximate the liability imposed for merchantability.

However, I do not believe this is an appropriate case to determine the extent and effect to be given to these similarities. The court, by the request for findings, was permitted to make only general findings on the buyer's counterclaim for

---

2. "An affirmation of the quality or condition of the thing sold, (not uttered as a matter of opinion or belief) made by the seller at the time of sale, for the purpose of assuring the buyer of the truth of the facts affirmed, and inducing him to make the purchase, if so received and relied on by the purchaser, is an express warranty." *Shippen* v. *Bowen* (1887), 122 U.S. 575, 7 S. Ct. 1283, 30 L. Ed. 1172.

negligence. Indiana Rules of Procedure, Trial Rule 52(D). It found against the buyer and there was evidence to support that result.

I would reverse for a determination of the liability, if any, of Corno for breach of express warranty.

NOTE.—Reported at 366 N.E.2d 3.